Craig A. PETERSON, Plaintiff,

v.

The NEW YORK TIMES COMPANY, a New York corporation, and The Associated Press, a New York corporation, Defendants.

No. 2:99CV242K.

United States District Court, D. Utah, Central Division.

Aug. 2, 2000.

Roger H. Hoole, Heather E. Morrison, Hoole & King LC, Salt Lake City, UT, for Craig A. Peterson, plaintiff.

Randy L Dryer, Parsons Behle & Latimer, Salt Lake City, UT, for New York Times, a New York Corporation, defendant.

Randy L Dryer, Parsons Behle & Latimer, Salt Lake City, UT, for Associated Press, a New York Corporation, defendant.

## MEMORANDUM DECISION AND ORDER

KIMBALL, District Judge:

Before the court is Defendant The Associated Press' (the "AP") Motion for Summary Judgment. A hearing on the motion was held on July 18, 2000. At the hearing, the AP was represented by Randy L. Dryer, and Plaintiff Craig A. Peterson ("Mr.Peterson") was represented by Roger H. Hoole. Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties. Since taking the matter under advisement, the court has further considered the law and facts relating to this motion. Now being fully advised, the court renders the following Memorandum Decision and Order.

## I. BACKGROUND

This case arises from the mistaken publication of Mr. Peterson's photograph in connection with a story about the Salt Lake Olympic Bid Committee (the "Bid Committee") scandal, which involved a different Craig Peterson. An internal ethics board of the Salt Lake Organizing Committee conducted an investigation of the Bid Committee's efforts to have Salt Lake City chosen as the site for the 2002 Olympic Winter Games. On February 9, 1999, the ethics board released a detailed report (the "Ethics Report") at a news conference. The Ethics Report focused on the allegedly questionable dealings of Tom Welch, president of the Bid Committee, and David Johnson, its vice president. The Ethics Report also briefly mentioned Craig Peterson, a former administrative officer of the Bid Committee. None of the individuals was identified by a middle initial.

On February 9, 1999, the AP wrote and transmitted a story about the Ethics Report to its member organizations. The AP also transmitted a file photo and caption of Mr. Peterson because an AP photo editor in New York believed that the Craig Peterson mentioned in the AP news story and referenced in the Ethics Report was the Craig Peterson shown in the AP's photo file. The caption stated that:

> Senate Majority Leader Craig Peterson stands in the State Capitol in Salt Lake City, in this undated photo. The top two officials of Salt Lake City's Olympic bid were condemned Tuesday Feb. 9, 1999 in an internal ethics investigation of the biggest corruption scandal in the history of the games. The report concentrated on the actions of Tom Welch, who directed the successful bid for the 2002 Winter Olympics, and Dave Johnson, his top lieutenant. The report also identified Peterson as a central player. Peterson handled finances for the bid committee after he joined in 1990 and continued in that job after the city won its bid and formed SLOC.

Unfortunately, the Craig Peterson pictured in the photograph was not the Craig Peterson associated with the Bid Committee; rather, it was the former Majority Leader of the Utah State Senate. The photo of Mr. Peterson was published in the February 10, 1999 edition of *The New York Times,* along with excerpts from the ethics report.

The AP photo editor testified that he does not know Mr. Peterson and bears him no ill will. The AP claims that the mix-up was a result of an honest mistake made in the context of a fast-breaking highly newsworthy story. Upon being notified of the mistake later that day, the AP immediately issued a "Photo Kill Advisory" that ordered all copies of the incorrect photo removed and destroyed from all archives and internet sites. On February 11, 1999, *The New York Times* published a correction. Mr. Peterson, however, sued the AP for libel and negligence.[1]

---

1. Mr. Peterson also sued *The New York Times* but agreed in October 1999 to dismiss that defendant. In his response to the AP's Motion for Summary Judgment, Mr. Peterson has also conceded that his negligence claim (the Second Cause of Action) against the AP must be dismissed.

## II. STANDARD OF REVIEW

A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate when the pleadings, depositions, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The movant bears an initial burden to demonstrate an absence of evidence to support an essential element of the non-movant's case. If the movant carries this initial burden, the burden then shifts to the non-movant to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of that element. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III. DISCUSSION

The AP has moved for summary judgment on the grounds that Mr. Peterson is both a public official and a public figure, and consequently, he must prove with convincing clarity that the AP published the photograph of Mr. Peterson knowing that it was the wrong one or entertaining serious doubts about whether it was the correct photo. *See, e.g., New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Van Dyke v. KUTV,* 663 P.2d 52, 54 (Utah 1983); *Jefferson County Sch. Dist. v. Moody's Investor's Servs., Inc.,* 175 F.3d 848 (10th Cir. 1999). The AP contends that because Mr. Peterson did not allege—and moreover,

cannot prove—that the AP acted with actual malice, the case must be dismissed.

Mr. Peterson does not contend that the AP acted with malice in using the wrong photograph. He argues, however, that he is not a public official or a public figure, and therefore he does not need to prove that the AP acted with malice. To support his claim that he is not a public figure, he claims that "only 8% of those polled by Dan Jones and Associates believed that a 'Craig Peterson' was either a state senator or otherwise involved in politics."[2] Moreover, Mr. Peterson claims that the United States Supreme Court in *New York Times* held that a communication concerning a public official, in order to be privileged by virtue of the official's status, must relate to official conduct. Mr. Peterson argues that the picture linking him to the Bid Committee scandal did not relate to his official conduct because it was not about him at all. Therefore, Mr. Peterson argues, he is merely a private citizen who need only establish that the AP acted negligently in using the incorrect photograph.

Thus, the central issue before the court is whether Mr. Peterson is a private citizen or whether he is a public official and/or a public figure. The parties agree that determining whether Mr. Peterson is a public official or public figure is a matter of law for the court to decide. *See Madsen v. United Television, Inc.,* 797 P.2d 1083 (Utah 1990). As the Utah Supreme Court has acknowledged, there is "a First Amendment interest in disposing of libel cases on motion and at an early state when it appears that a reasonable jury could not

---

**2.** Between February 18 and 24, 1999, Dan Jones and his staff conducted a random survey of 407 Utah residents, which Mr. Peterson claims is statistically significant and representative of the general populous of Utah with a margin of error of plus or minus 5%. The purported purpose of the poll was to ascertain the existence and extent of Mr. Peterson's fame or notoriety in Utah, if any. The results of the poll are as follows:

(a) 24% of those polled had heard of a "Craig Peterson";

(b) 8% of those polled believed "Craig Peterson" was either a state senator or otherwise involved in politics;

(c) 1% of those polled associated "Craig Peterson" with the Olympics;

(d) In an open-ended question, less than 1% of those polled associated "Craig Peterson" with the Olympic scandal; and

(e) In open-ended questions, 1% of those polled named "Craig Peterson" as a past of current majority leader of the Utah State Senate or as a past or current member of the Utah Legislature.

find for the plaintiffs." *Cox v. Hatch,* 761 P.2d 556, 560 (Utah 1988).

### A. Is Mr. Peterson a Public Official?

There is no doubt that Mr. Peterson was a public official until November 1998. Before Mr. Peterson resigned in November 1998—less than three months before the AP published the story on the Bid Committee scandal—he had served in the Utah Legislature for twelve years, including ten years in the State Senate (from 1988 until November 1998). During that time, he served as Majority Whip (1993 to 1994) and then Senate Majority Leader from 1995 to November 1998, at which time he stepped down. Thus, the question is whether he retained his public official status at the time that his photograph was mistakenly published with the story about the Bid Committee scandal, in February 1999.

■ In *Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), the United States Supreme Court analyzed an issue about an individual who was no longer in office and stated that "[i]t is not seriously contended, and could not be, that the fact respondent no longer supervised the [County Recreation] Area when the column appeared has decisional significance." *Id.* at 87 n. 14, 86 S.Ct. 669. Similarly, in *Gray v. Udevitz,* 656 F.2d 588 (10th Cir.1981), the Tenth Circuit rejected the plaintiff's argument that he " 'was not a public official at the time of publication of the allegedly libelous matter and was not, therefore required to meet the *New York Times v. Sullivan* burden of proof standards.' " *Id.* at 590 n. 3. The court found that the fact "that the person defamed no longer holds the same position does not by itself strip him of his status as a public official for constitutional purposes." *Id.* Numerous other courts have reached the same conclusion, often when the plaintiff had been out of office for a much longer period than Mr. Peterson. *See, e.g., Pierce v. Capital Cities Communications, Inc.,* 576 F.2d 495, 510 n. 67 (3d Cir.1978) ("The passage of some three years between the time of Pierce's depar-

ture from the Port Authority and the airing of the broadcast did not, by itself, strip Pierce of his status as a 'public official' for purposes of analyzing this case."), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978); *Zerangue v. TSP Newspapers, Inc.,* 814 F.2d 1066, 1069 (5th Cir.1987) (determining that the public official status of a deputy sheriff and chief of detectives had not eroded with time, even though they had been discharged six years prior to the publication at issue). Accordingly, Mr. Peterson did not lose his public official status in the approximately three months between his resignation as Senate Majority Whip and the time of the publication of the AP story. That conclusion, however, does not end the inquiry.

■ In *Gray,* the Tenth Circuit addressed the test for determining whether someone is a public official and held that "[t]wo prerequisites must be met for the *New York Times* [malice] standard to apply. The plaintiff must be a public official for the purpose of the article[,] and the defamatory statements must relate to his official conduct." *Gray,* 656 F.2d at 590–91 (internal footnote omitted); *see also Madsen v. United Television, Inc.,* 797 P.2d 1083, 1084 (Utah 1990). Having already determined in this case that the first element has been satisfied, the court must determine whether the defamation related to Mr. Peterson's official conduct.

Mr. Peterson contends that he never participated in any effort to secure the Olympic bid for Salt Lake City, nor did he have any involvement with the Salt Lake Organizing Committee. Consequently, he argues, the false caption that accompanied his image does not relate to his official conduct in the State Legislature. He concedes that he may be a public official for the limited purpose of articles or news stories concerning his official actions as a Utah State Senator, but not for purposes of the Olympic bribery scandal, the AP's false caption and the February 9, 1999 use of his image.

Mr. Peterson relies on *Ryder v. Time, Inc.*, 557 F.2d 824 (D.C.Cir.1976), another case of mistaken identity. The plaintiff in that case was Richard J. Ryder, a lawyer who had been a member of the Virginia House of Delegates for almost a year and who had been an unsuccessful candidate for the Virginia State Senate. At the time that he brought suit, he was not the holder of any public office. Richard R. Ryder was also a Virginia attorney. In 1967, Richard R. Ryder had been suspended from practice because he had concealed stolen money and a sawed-off shotgun—given to him by a client—in his safe-deposit box. In 1973, *Time* magazine published an essay lamenting the great number of attorneys who had abused their positions of public trust during the Watergate scandal. The essay highlighted the Richard R. Ryder story; however, the essay did not specify Mr. Ryder's middle initial; rather, it named "Virginia attorney Richard Ryder." Richard J. Ryder filed suit, alleging that he had been damaged because of the omission of the middle initial. The appellate court reversed the lower court's determination that the plaintiff was a public figure. On appeal, the court determined that, although the plaintiff had been a public official, his public activities had nothing to do with the reference to the Richard Ryder in the essay, and he was no longer holding public office.

In contrast, in the present case, the AP argues that the photo and caption—although wrong—indeed made a statement about Mr. Peterson's official conduct. The caption referred to Mr. Peterson as the Majority Leader of the State Senate and reported that he was associated with the Olympic Bid Committee improprieties. The AP contends that the alleged wrongdoing occurred while Mr. Peterson held his powerful legislative office. Thus, the AP points out, the allegations, if true, would bear on Mr. Peterson's fitness for office and his public stewardship as Senate Majority Leader. The AP points out that the caption was, of course, erroneous, but it was the kind of good faith error about public controversies and public officials

that the broad protections announced in *New York Times* were meant to cover.

The AP relies on a recent decision, *Jones v. New Haven Register, Inc.*, 393657, 2000 WL 157704 (Conn.Super.Ct. Jan.31, 2000), which is somewhat similar to the case at bar. In *Jones*, a newspaper published a front-page article concerning the re-arrest and underlying conviction of "William B. Jones" for violating his parole and stealing $14,000 from the local NAACP. Accompanying the article was a file photograph of "Jones." The picture was actually of another William B. Jones who was an individual of local prominence who had previously held an elected office for numerous years. The newspaper moved for summary judgment dismissing the plaintiff's complaint on the grounds that the plaintiff was a public official and that the requisite malice could not be proven.

In granting the motion, the *Jones* court held that (1) although the plaintiff had not been in public office since 1979, his status as a public figure continued, and he remained a public figure at the time of the publication in 1996 and therefore was required to prove malice; and (2) the *New York Times* malice standard applies to a situation in which a photograph of a public figure is mistakenly juxtaposed with an article about someone else. *Id.* at *4–5. The court noted that, although the plaintiff had not held elected office for almost twenty years, he had continued to be involved in community affairs and public service. *Id.* at *5.

■ In the instant case, the court is faced with the task of determining whether the alleged defamation relates to Mr. Peterson's official conduct when the defamatory statement is the juxtaposition of a public official's photograph with an article about someone else with the same name. Mr. Peterson would have the court conclude that the statements linking him with the Bid Committee bribery scandal *cannot* pertain to his official conduct because the false statements were not even about

him—they were about a different Craig Peterson. Thus, Mr. Peterson appears to be asking the court to establish a different standard for "mistaken identity" defamation than for the more typical "mistaken information" defamation.

However, the court finds no support in the law for such a proposition. Under *New York Times* and its progeny, there is no indication that, barring malicious errors, one type of error (a reporter who incorporates incorrect facts, for example) deserves more protection than another (a photo editor who couples a photo of an individual with a story about a different individual with the same name). Moreover, there is no material distinction between defamation caused by mistaken identity and defamation due to any other reason. While Mr. Peterson claims that the story about the Bid Committee scandal did not relate to him and therefore did not pertain to his official conduct as a public official, that analytical framework is simply incorrect. Because of the mistake regarding Mr. Peterson's identity, the story purported to concern him, and the alleged improprieties discussed in the story occurred during the time that Mr. Peterson held the position of Senate Majority Leader. Consequently, the defamation related to his official conduct. The fact that the defamation arose from associating his photo with a story about the alleged improprieties of another Craig Peterson—instead of from false information—is immaterial.

The *Ryder* case, relied upon by Mr. Peterson, does not suggest otherwise because, in that case, it was clear that the alleged wrongdoing did not occur during the time that the plaintiff held office. In addition, although the *Jones* case did not involve a situation in which the court had to determine whether the alleged defamation related to the plaintiff's official duties—because the defamation did not concern the period during which the plaintiff held office—the *Jones* court's determination that the *New York Times* malice standard applies to a situation in which a photograph of a public figure is mistakenly juxtaposed with an article about someone else also comports with this court's conclusion.

Finally, the court's conclusion is further supported by the rationale underlying *New York Times* and its progeny. Specifically, in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court pointed out that errors are an inevitable by-product of a free press, "[a]nd punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press." 418 U.S. at 340, 94 S.Ct. 2997; *see also New York Times,* 376 U.S. at 271–72, 84 S.Ct. 710 (1964). With respect to a private individual, that risk is counterbalanced by the legitimate state interest in compensating those individuals "for the harm inflicted on them by defamatory falsehood." *Id.* at 341, 84 S.Ct. 710. But the balancing of interests is different when it comes to public figures. "Public officials and public figures usually enjoy significantly greater access to channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Id.* at 344, 84 S.Ct. 710.

Indeed, such is true in the case at bar, as evidenced by the fact that a correction was made the next day, and the local print media have published several articles regarding Mr. Peterson's lawsuit. Had Mr. Peterson been a private citizen, it is unlikely that the media would have taken such an interest in his lawsuit.

In finding that Mr. Peterson was a public official and that the defamatory statements—although inaccurate—pertained to his official conduct while in office, the court has simply applied the law that it is bound to follow. The court is in no way attempting to trivialize the misfortune that Mr. Peterson has suffered. It takes a good part of one's lifetime to establish a good reputation, and when that hard-earned reputation is tarnished in a mere day by an unfortunate error, one is certain

to be left in despair. The law is clear, however, that given these circumstances, Mr. Peterson's misfortune is not actionable.

## B. *Is Mr. Peterson a Public Figure?*

In *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), "public figures" who are not public officials were brought within the ambit of the *New York Times* [malice] standard. *Id.* at 155, 87 S.Ct. 1975. Subsequently, in *Gertz*, the United States Supreme Court explained that "[a]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." *Gertz*, 418 U.S. at 352, 94 S.Ct. 2997; *see also Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 903 n. 20 (Utah 1992) ("A public figure is one who has either (1) attained special prominence in the affairs of society and thus assumes a public figure role voluntarily, or (2) thrust himself or herself to the forefront of public controversies in order to affect the outcome of those controversies.").

■ Mr. Peterson contends that he has "not achieved 'general fame or notoriety' such that he can be deemed a public figure for all aspects of his life." Alternatively, in order to be considered a limited purpose public figure, Mr. Peterson claims that he must "thrust himself into the vortex of th[e] public issue, [or] engage the public's attention in an attempt to influence its outcome." *Gertz*, 418 U.S. at 352, 94 S.Ct. 2997. Mr. Peterson claims that he has not "thrust himself into the vortex" of the Olympic bid scandal in any way and is therefore not a limited purpose public figure. He claims that the results of the Dan Jones poll "clearly demonstrate that no Craig Peterson in Utah—regardless of their middle initial—can be considered a public figure." Mr. Peterson contends that he is not generally known, even in Utah.

On the other hand, the AP argues that Mr. Peterson is a public figure. It claims that a former Majority Leader of the State Senate, who was one of Utah's most influential politicians, who promptly enters the revolving door to act as a paid lobbyist representing scores of powerful interests before his former colleagues in the Legislature is a public figure. In addition, the AP contends that it cannot be disputed that Mr. Peterson was a public figure at the time the conduct in question occurred. Moreover, the AP contends that the Dan Jones poll is evidence that Mr. Peterson is a general purpose public figure in Utah, but it also contends that Mr. Peterson confuses name recognition with public figure status.

A politician is the archetypal public figure. *Partington v. Bugliosi*, 825 F.Supp. 906, 917 (D.Hawai'i 1993). Given Mr. Peterson's prominent and long history in Utah politics, the fact that he had resigned from his seat in the Legislature less than three months before the article was published, and his continued involvement in shaping public policy, this court finds that Mr. Peterson has attained special prominence in the affairs of society and is a general purpose public figure.

This determination comports with the rationale of *New York Times* and its progeny because Mr. Peterson has enjoyed significantly greater access to the channels of effective communication than do private individuals, and he therefore has had a better opportunity to respond to false statements about himself—as reflected by the immediate correction and the subsequent news stories about his lawsuit. This "greater access" enjoyed by a public figure is one of the reasons articulated by the United States Supreme Court to differentiate a public figure from a private figure who does not have such access. *See, e.g., Gertz*, 418 U.S. at 344, 94 S.Ct. 2997 (finding that public figures and officials typically enjoy significantly greater access to the channels of effective communication than do private individuals, and they therefore have a better opportunity to respond to false statements about themselves). In

addition, by becoming a public official, Mr. Peterson voluntarily exposed himself to the risk of injury from defamatory falsehoods. *See Gertz,* 418 U.S. at 344–45, 94 S.Ct. 2997 (public officials have voluntarily exposed themselves to the risk of injury from defamatory falsehoods).

Further, while the court does not want to imply that survey results are determinative of "public figure" status, and it is true that the survey results likely confuse name recognition with public figure status, the court notes that the fact that 8% of the population of Utah believes that Craig Peterson was a State Senator or otherwise involved in politics is not inconsistent with the court's finding that Mr. Peterson is a public figure.

## IV. CONCLUSION

For the foregoing reasons, and good cause appearing, IT IS HEREBY ORDERED that the AP's Motion for Summary Judgment is GRANTED and Mr. Peterson's case is DISMISSED.[3] Each party shall bear its own costs.

---

**3.** Because *The New York Times* was previously dismissed with prejudice, and there are no remaining defendants, this case is now dismissed in its entirety.