TOMKIEWICZ v THE DETROIT NEWS, INC

Docket No. 217995. Submitted January 10, 2001, at Detroit. Decided July 10, 2001, at 9:05 A.M.

Gary Tomkiewicz, a lieutenant in the Dearborn Heights Police Department, brought an action in the Wayne Circuit Court against The Detroit News, Inc., alleging libel and "false light" invasion of privacy after the defendant, in its newspaper, published a photograph of the plaintiff and misidentified the photograph as that of Dearborn Heights police officer Kevin DeHart, of whom the defendant, in an article that accompanied the photograph, reported had entered into a plea bargain on a charge of stalking his neighbor and had been suspended from the police force. The court, Susan D. Borman, J., granted summary disposition for the defendant, ruling that there existed no genuine issues of material fact and the defendant was entitled to judgment as a matter of law. The plaintiff appealed.

The Court of Appeals *held*:

1. A qualified privilege extends to a defendant who makes a defamatory statement concerning a public official when the statement relates to the official's conduct in office. A public official is prohibited from recovering damages for a defamatory falsehood relating to official conduct unless the official proves that the statement was made with actual malice, i.e., with knowledge that it was false or with reckless disregard of whether it was false or not.

2. The plaintiff, as a police lieutenant, is a public official for purposes of defamation. The plaintiff is a government employee who has, or appears to the public to have, substantial responsibility for or control over the conduct of government affairs, and his position is one that invites public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy.

3. A statement concerning a public official's fitness for office is subject to the qualified privilege. A charge of criminal conduct by a public official is relevant to the official's fitness for office. The defendant's article and photograph conveyed that the plaintiff had been charged with a crime. The article and the photograph related to the plaintiff's official conduct and are therefore protected by the qualified privilege.

4. The record in this case does not contain clear and convincing evidence from which a rational jury could conclude that the defendant's defamatory statement about the plaintiff was made with actual malice. Insufficient efforts by the defendant's photographer in ascertaining which photograph of men at DeHart's court hearing was DeHart does not establish the reckless disregard of truth necessary for a finding of actual malice.

5. The plaintiff's false light invasion of privacy claim is subject to, and was properly dismissed summarily under, the same analysis that applies to his defamation claim.

Affirmed.

1. LIBEL AND SLANDER — ACTIONS.

A plaintiff seeking to establish a claim of defamation must show a false and defamatory statement concerning the plaintiff, an unprivileged communication to a third party, fault amounting to at least negligence on the part of the publisher, and either actionability of the statement irrespective of special harm or the existence of special harm caused by publication.

2. LIBEL AND SLANDER — PUBLIC OFFICIALS — QUALIFIED PRIVILEGE.

A public official is prohibited from recovering damages for a defamatory falsehood relating to official conduct unless the official proves that the statement was made with actual malice, i.e., with knowledge that it was false or with reckless disregard of whether it was false or not.

3. LIBEL AND SLANDER — PUBLIC OFFICIALS — QUALIFIED PRIVILEGE — OFFICIAL CONDUCT.

A defamatory statement concerning a public official's fitness for office or criminal wrongdoing is a statement that relates to official conduct and, as such, is protected by qualified privilege.

*Frank G. Becker & Associataes* (by *Frank G. Becker* and *Gregory D. Bill*), for the plaintiff.

*Butzel Long* (by *James E. Stewart, Eugene H. Boyle, Jr.,* and *Laurie J. Michelson*), for the defendant.

Before: ZAHRA, P.J., and SMOLENSKI and GAGE, JJ.

GAGE, J. Plaintiff appeals as of right from an order granting defendant summary disposition of his defa-

mation and false light invasion of privacy claims. We affirm.

I

Plaintiff, a lieutenant with the city of Dearborn Heights Police Department, was the lead investigator into allegations of stalking against fellow city of Dearborn Heights Police Officer Kevin DeHart. In its newspaper dated January 8, 1998, defendant published an article headlined "Cop faces stalking charge." Another emboldened line of print that appeared before the article's text explained, "Next-door neighbor says officer and his wife harassed her after affair ended." The text of the article discussed DeHart's entry into a plea bargain involving his suspension from the police department and agreement to refrain from further stalking of the complainant.[1] Unfortunately, a photograph of plaintiff, captioned "Officer Kevin DeHart was suspended without pay after he was charged with stalking a neighbor," was printed alongside the article. A photographer employed by defendant had taken plaintiff's photograph while he attended a district court hearing concerning the criminal charges against DeHart. On January 9, 1998, defendant printed a brief correction clarifying that plaintiff was not DeHart.

Plaintiff filed the instant complaint asserting claims of defamation and false light invasion of privacy. Defendant responded by moving for summary disposition pursuant to MCR 2.116(C)(10), alleging that (1) its publication of plaintiff's photograph was "an hon-

---

[1] DeHart's wife also was charged with stalking the complainant and likewise entered into the plea bargain.

est mistake," (2) plaintiff qualified as a public official because of his high rank in the police department, and (3) plaintiff could not establish defendant's actual malice. The trial court found that plaintiff qualified as a public official because when his photograph was taken he appeared in court in his official capacity as the officer investigating the stalking charges. The trial court also determined that the evidence regarding the placement of plaintiff's photograph with the stalking article did not support a finding of defendant's actual malice, and granted defendant's motion for summary disposition.

II

This Court reviews de novo a trial court's summary disposition ruling. *Collins v Detroit Free Press, Inc*, 245 Mich App 27, 31; 627 NW2d 5 (2001). A motion under MCR 2.116(C)(10) tests a claim's factual support. In reviewing a motion brought pursuant to subsection C(10), we must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence submitted in the light most favorable to the nonmoving party to determine whether a genuine issue of fact exists to warrant trial or the moving party is entitled to judgment as a matter of law. *Kefgen v Davidson*, 241 Mich App 611, 616; 617 NW2d 351 (2000).

When addressing allegations of defamation against media defendants, courts must remain cognizant of the important, competing interests involved in resolving these claims:

Two competing legal regimes collide in libel cases implicating First Amendment concerns. Libel law enforces society's "pervasive and strong interest in preventing and

redressing attacks upon reputation" caused by false and defamatory statements, while constitutional law safeguards the free flow of ideas and opinions on matters of public interest that lie at "the heart of the First Amendment's protection." The inherent analytical tension between these regimes requires a court both to protect reputational interests, and to accord "breathing space" to principles of freedom of press and speech. [*Locricchio v Evening News Ass'n*, 438 Mich 84, 88; 476 NW2d 112 (1991), quoting *Rosenblatt v Baer*, 383 US 75, 86; 86 S Ct 669; 15 L Ed 2d 597 (1966), and *First Nat'l Bank of Boston v Bellotti*, 435 US 765, 776; 98 S Ct 1407; 55 L Ed 2d 707 (1978).]

The involvement of First Amendment freedoms mandates a closer degree of scrutiny by this Court in reviewing defamation claims.

"When addressing defamation claims implicating First Amendment freedoms, appellate courts must make an independent examination of the record to ensure against forbidden intrusions into the field of free expression and to examine the statements and circumstances under which they were made to determine whether the statements are subject to First Amendment protection."

Thus, we recognize that we must consider society's interest in free expression, in addition to the interests of the individual parties. We also recognize that summary disposition is an essential tool in the protection of First Amendment rights. [*Ireland v Edwards*, 230 Mich App 607, 613; 584 NW2d 632 (1998), quoting *Northland Wheels Roller Skating Center, Inc v Detroit Free Press*, 213 Mich App 317, 322; 539 NW2d 774 (1995).]

III

To establish a claim of defamation by libel a plaintiff must show (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting to at least

negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication. *Rouch v Enquirer & News of Battle Creek (After Remand)*, 440 Mich 238, 251; 487 NW2d 205 (1992). In this case the first element undisputedly was established: defendant's publication of the mislabeled photograph identifying plaintiff as the police officer who stalked his former mistress certainly tends to harm plaintiff's reputation "so as to lower him in the estimation of the community or deter others from associating or dealing with him." *American Transmission, Inc v Channel 7 of Detroit, Inc*, 239 Mich App 695, 702; 609 NW2d 607 (2000).[2]

A

The first disputed issue that we must resolve is whether a privilege protected defendant's defamatory article concerning plaintiff. It is well established that the United States Constitution affords a qualified privilege protecting the making of defamatory statements concerning public officials[3] when the statements re-

---

[2] We further note that defendant's publication of the article alleging stalking against plaintiff constitutes defamation per se, satisfying element 4 of the prima facie case of libel. See *Burden v Elias Bros Big Boy Restaurants*, 240 Mich App 723, 727-728; 613 NW2d 378 (2000) ("[W]ords charging the commission of a crime are defamatory per se, and hence, injury to the reputation of the person defamed is presumed to the extent that the failure to prove damages is not a ground for dismissal."). See also MCL 600.2911(1) ("[W]ords imputing the commission of a criminal offense" "are actionable in themselves.").

[3] A qualified privilege may also protect defamatory remarks regarding "public figures." *Gertz v Robert Welch, Inc*, 418 US 323, 342-345; 94 S Ct 2997; 41 L Ed 2d 789 (1974). We do not address whether plaintiff could qualify as a public figure.

late to the official's conduct in office.[4]

> The constitutional guarantees [within the First and Fourteenth Amendments] require . . . a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not. [*New York Times Co v Sullivan*, 376 US 254, 279-280; 84 S Ct 710; 11 L Ed 2d 686 (1964).]

See also MCL 600.2911(6),[5] *Peterfish v Frantz*, 168 Mich App 43, 49-50; 424 NW2d 25 (1988), quoting *New York Times, supra*. The Supreme Court in *New York Times* did not conclusively define the parameters of the category of public officials, noting that "[w]e have no occasion here to determine how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included." *New York Times, supra* at 283, n 23.

Whether plaintiff, a police lieutenant, qualifies as a public official guides the outcome of this case. No Michigan cases specifically address a police lieuten-

---

[4] See *Rouch, supra* at 251-252, noting that "[i]n addition to satisfying Michigan's common-law requirements for a libel cause of action, a litigant must comply with constitutional requirements . . . focus[ing] on 'the public- or private-figure status of the plaintiff,' the media or nonmedia status of the defendant, and the public or private character of the speech,'" quoting *Locricchio, supra* at 118.

[5] Subsection 2911(6) states as follows:

An action for libel or slander shall not be brought based upon a communication involving public officials or public figures unless the claim is sustained by clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether or not it was false.

ant's qualification as a public official in the context of defamation law and the *New York Times* qualified privilege. In *Peterfish, supra* at 50-51, this Court received some guidance from the United States Supreme Court with respect to who constitutes a public official:

> In *Rosenblatt v Baer*, 383 US 75; 86 S Ct 669; 15 L Ed 2d 597 (1966), the United States Supreme Court, in defining for the first time the term "public official," stated:
>
> "It is clear, therefore, that the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs. [383 US 85.]"
>
> By way of elaboration on the Court's definition, it continued:
>
> "Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements we identified in New York Times are present and the New York Times malice standards apply. [383 US 86.]"
>
> Finally, the Court pointed out, by way of footnote:
>
> "The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy. [383 US 8[6], n 13.]"

The determination whether a privilege exists constitutes a legal question for the court.[6] *Peterfish, supra* at 49.

---

[6] The Supreme Court in *Rosenblatt* rejected that state law standards could define the category of public officials for purposes of applying the constitutional qualified privilege. The Supreme Court explained that "[s]tates have developed definitions of 'public official' for local administrative purposes, not the purposes of a national constitutional protection,"

While no Michigan case addresses whether a police officer or police lieutenant qualifies as a public official in the context of a defamation action, several cases have concluded that other law enforcement personnel constituted public officials. In a case predating *New York Times, supra,* the Michigan Supreme Court held that a media defendant was entitled to a qualified privilege for "abusive and extreme, vitriolic" criticism the defendant leveled at the plaintiff, a Detroit deputy superintendent of police. *Lawrence v Fox,* 357 Mich 134, 135, 146; 97 NW2d 719 (1959). The Court in *Lawrence* explained that the media defendant's privilege existed because "[a] newspaper was commenting upon the *performance of duty by a public official.*" *Id.* at 146 (emphasis added). Two post *New York Times* panels of this Court also found, without much analysis or explanation, that law enforcement personnel qualified as public officials. In *Postill v Booth Newspapers, Inc,* 118 Mich App 608, 612, 619; 325 NW2d 511 (1982), this Court held that the defendants were entitled to invoke the *New York Times* qualified privilege protecting allegedly defamatory statements they made regarding the plaintiffs, the Washtenaw County Sheriff and an appointed county jail administrator, because the plaintiffs "were public officials defamed in their roles as such." In *Spreen v Smith,* 153 Mich App 1, 7; 394 NW2d 123 (1986), another panel of this Court similarly held that the "[p]laintiff, a sheriff, clearly falls within the category of 'public

while the Court's "decision in *New York Times* . . . draws its force from the constitutional protections afforded free expression." *Rosenblatt, supra* at 84. The Court concluded that "[t]he standards that set the scope of its [the *New York Times* decision's] principles cannot therefore be such that 'the constitutional limits of free expression in the Nation would vary with state lines.'" *Id.*

official,' " citing *Postill, supra* at 619, who could prevail in his defamation action only by showing the defendants' actual malice.

We find that plaintiff, a lieutenant within a municipal police department, falls within the scope of "public official" as defined by the Supreme Court in *Rosenblatt*, given the significant authority and control his office affords him over the daily lives of other citizens. We find instructive and persuasive the following reasoning of courts that have determined that both lower ranking law enforcement officers and police lieutenants qualify as public officials for purposes of applying the *New York Times* privilege.

> It is our opinion that the plaintiff is within the "public official" classification. Although as a patrolman he is "the lowest in rank of police officials" and would have slight voice in setting departmental policies, his duties are peculiarly "governmental" in character and highly charged with the public interest. It is indisputable that law enforcement is a primary function of local government and that the public has a far greater interest in the qualifications and conduct of law enforcement officers, even at, and perhaps especially at, an "on the street" level than in the qualifications and conduct of other comparably low-ranking government employees performing more proprietary functions. The abuse of a patrolman's office can have great potentiality for social harm; hence, public discussion and criticism directed towards the performance of that office cannot constitutionally be inhibited by threat of prosecution under State libel laws. [*Coursey v Greater Niles Twp Publishing Corp*, 40 Ill 2d 257, 264-265; 239 NE2d 837 (1968) (concluding that a former patrolman of Skokie, Illinois, qualified as a public official).]

The Supreme Court of New Jersey in *Costello v Ocean Co Observer*, 136 NJ 594; 643 A2d 1012 (1994), specifi-

cally concluded that a municipal police lieutenant was a public official according to the following logic:

> Although *New York Times v Sullivan* involved an *elected* city commissioner, subsequent cases have concluded that non-elected government employees can be public figures for the purposes of a defamation suit. *E.g.*, *Henry v Collins*, 380 US 356, 357; 85 S Ct 992, 993; 13 L Ed 2d 892, 893 (1965) (holding that chief of police is public official); *Time, Inc v Pape*, 401 US 279, 284; 91 S Ct 633, 636; 28 L Ed 2d 45, 50 (1971) (accepting lower courts' determination that city's Deputy Chief of Detectives was public official).

> \*     \*     \*

> A police officer on a beat is the member of the department who is most visible to the public. He possesses both the authority and the ability to exercise force. Misuse of his authority can result in significant deprivation of constitutional rights and personal freedoms, not to mention bodily injury and financial loss. The strong public interest in ensuring open discussion and criticism of his qualifications and job performance warrant the conclusion that he is a public official. [*Gray v Udevitz*, 656 F2d 588, 591 (CA 10, 1981).]

> As a police lieutenant, [the plaintiff]'s responsibilities to the public exceed those owed by officers on patrol. In addition to being visible to the public and possessing authority to use force, a lieutenant supervises other officers. . . . The public therefore has a valid interest in [the plaintiff]'s qualifications and on-the-job behavior as a lieutenant. "A wholesome respect for the law by those who are enforcing the law is . . . of great importance in a society that is dedicated to the preservation of individual human dignity." *Prosser & Keeton, Torts, supra* at 113. [*Costello, supra* at 612-613, 613-614.]

For numerous other cases similarly holding that various federal, state, county, and municipal law enforcement officers qualify as public officials in the context

of defamation actions, see 44 ALR5th 193, §§ 19-21(a), pp 281-306.

We agree with the analyses set forth above. We are satisfied that in light of a police lieutenant's empowerment to substantially affect the lives of the general public, the lieutenant's position "invite[s] public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." *Rosenblatt, supra* at 86, n 13.

B

Our determination that plaintiff, a police lieutenant, is a public official does not end our analysis. The Supreme Court in *New York Times* explained that the qualified privilege for defamatory remarks regarding public officials applied only to remarks related to the public official's "official conduct." *Id.* at 279-283. Subsequently, in *Garrison v Louisiana*, 379 US 64, 77; 85 S Ct 209; 13 L Ed 2d 125 (1964), the Supreme Court explained that "[t]he public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, *anything which might touch on an official's fitness for office is relevant.*" (emphasis added).

Plaintiff essentially argues that the *New York Times* privilege regarding commentary on public officials does not apply in this case to defendant's article regarding the police officer stalker because the article was not related to plaintiff's official conduct, but merely misidentified plaintiff as DeHart. As plaintiff's complaint decries, however, defendant's stalking article and accompanying photograph clearly convey that

plaintiff is the police officer charged with stalking his former lover. In *Monitor Patriot Co v Roy*, 401 US 265, 277; 91 S Ct 621; 28 L Ed 2d 35 (1971), the Supreme Court held "as a matter of constitutional law that a charge of criminal conduct, no matter how remote in time or place, can never be irrelevant to an official's . . . fitness for office for purposes of application of the 'knowing falsehood or reckless disregard' rule of *New York Times Co v Sullivan*." Because plaintiff police lieutenant is a public official, and defendant's stalking article and accompanying photograph of plaintiff convey that plaintiff was charged with a crime, the article's allegations, though incorrect, are relevant to plaintiff's fitness for his office. *Monitor Patriot Co, supra.*

We further note that the federal district court's opinion in *Peterson v New York Times Co*, 106 F Supp 2d 1227 (D Utah, 2000), is supportive of our conclusion. The court addressed a libel suit by a former Utah state senator regarding "the mistaken publication of [plaintiff Craig A.] Peterson's photograph in connection with a story about the Salt Lake Olympic Bid Committee . . . scandal, which involved a different Craig Peterson." *Id.* at 1228. The court found that the plaintiff qualified as a public official, *id.* at 1230, and rejected the plaintiff's argument that the defamatory statements did not relate to his official conduct.

> Mr. Peterson contends that he never participated in any effort to secure the Olympic bid for Salt Lake City, nor did he have any involvement with the Salt Lake Organizing Committee. Consequently, he argues, the false caption does not relate to his official conduct in the State Legislature. He concedes that he may be a public official for the limited purpose of articles or news stories concerning his official actions as a Utah State Senator, but not for purposes of the

Olympic bribery scandal, the AP's false caption and the February 9, 1999 use of his image.

*        *        *

[T]he court is faced with the task of determining whether the alleged defamation relates to Mr. Peterson's official conduct when the defamatory statement is the juxtaposition of a public official's photograph with an article about someone else with the same name. Mr. Peterson would have the court conclude that the statements linking him with the Bid Committee bribery scandal *cannot* pertain to his official conduct because the false statements were not even about him—they were about a different Craig Peterson. [Emphasis in original.] Thus, Mr. Peterson appears to be asking the court to establish a different standard for "mistaken identity" defamation than for the more typical "mistaken information" defamation.

However, the court finds no support in the law for such a proposition. Under *New York Times* and its progeny, there is no indication that, barring malicious errors, one type of error (a reporter who incorporates incorrect facts, for example) deserves more protection than another (a photo editor who couples a photo of an individual with a story about a different individual with the same name). *Moreover, there is no material distinction between defamation caused by mistaken identity and defamation due to any other reason.* [Emphasis added.] While Mr. Peterson claims that the story about the Bid Committee scandal did not relate to him and therefore did not pertain to his official conduct as a public official, that analytical framework is simply incorrect. *Because of the mistake regarding Mr. Peterson's identity, the story purported to concern him, and the alleged improprieties discussed in the story occurred during the same time that Mr. Peterson held the position of Senate Majority Leader.* [Emphasis added.] Consequently, the defamation related to his official conduct. The fact that the defamation arose from associating his photo with a story about the alleged improprieties of another Craig Peterson—instead of from false information—is immaterial. [*Peterson, supra* at 1230, 1231-1232.]

In the similar situation presented by the instant case, because of the mistake involving plaintiff's identity, defendant's article purported to concern plaintiff and alleged improprieties that occurred while plaintiff was a police lieutenant. We therefore conclude that the alleged criminal stalking acts related to plaintiff's official conduct.[7]

IV

Because plaintiff police lieutenant is a public official and defendant's defamatory article related to plaintiff's qualifications for his office, plaintiff may recover damages only on his showing of defendant's actual malice. "A public [official] claiming defamation must prove by clear and convincing evidence that the publication was a defamatory falsehood and that it was made with actual malice through knowledge of

---

[7] See also *Jones v New Haven Register, Inc,* 26 Conn L Rptr 299; 2000 WL 157704 ** 5-7 (2000) (concluding that the general purpose public figure plaintiff, whose photograph mistakenly accompanied an article that alleged theft and parole violations by an individual sharing the plaintiff's name, had to demonstrate actual malice by the defendants); *Strong v Oklahoma Publishing Co,* 899 P2d 1185, 1186, 1188-1189 (Okla App, 1995) (The defendant published an article regarding the trial of a charged rapist and mistakenly printed a photograph of the plaintiff, identifying him in the photograph's caption as the charged rapist. The court nonetheless concluded that the plaintiff, who was a public official by virtue of his position as a school board vice president, had to satisfy the actual malice standard of liability.); *Goodrick v Gannett Co, Inc,* 500 F Supp 125, 126 (D Del, 1980) (The plaintiff, who was a public official "by virtue of his position as Assistant Public Defender," sued the defendant after it published an article regarding a county jail inmate accompanied by a photograph of the inmate that the defendant mistakenly captioned with the plaintiff's name. The court determined that "[a]lthough the reference in the publication concerning plaintiff had nothing to do with plaintiff's official conduct on it [sic] face, the rule of the *New York Times* case is nevertheless applicable" because "a charge of criminal conduct against an official or a candidate, no matter how remote in time or place is always 'relevant to [an official's] fitness for office,'" quoting *Monitor Patroit Co, supra.*).

its falsity or through reckless disregard for the truth."
*Kefgen, supra* at 624.

> "Actual malice is defined as knowledge that the published
> statement was false or as reckless disregard as to whether
> the statement was false or not. Reckless disregard for the
> truth is not established merely by showing that the state-
> ments were made with preconceived objectives or insuffi-
> cient investigation. Furthermore, ill will, spite or even
> hatred, standing alone, do not amount to actual malice.
> 'Reckless disregard' is not measured by whether a reason-
> ably prudent man would have published or would have
> investigated before publishing, but by whether the publisher
> in fact entertained serious doubts concerning the truth of
> the statements published." [*Ireland, supra* at 622, quoting
> *Grebner v Runyon*, 132 Mich App 327, 332-333; 347 NW2d
> 741 (1984).]

Whether the evidence is sufficient to support a find-
ing of malice constitutes a question of law. *Kefgen,
supra* at 624-625. In considering whether actual mal-
ice exists in the context of a motion for summary dis-
position, the court must consider whether the evi-
dence is sufficient to allow a rational finder of fact to
find actual malice by clear and convincing evidence.
*Ireland, supra.*

The affidavits and deposition testimony filed with
the trial court show that a photographer and a
reporter working for defendant each attended
DeHart's January 7, 1998, court hearing. The photog-
rapher indicated that he heard DeHart's case called
and saw a group of five or six individuals rise and
approach the bench. Although the photographer
acknowledged that the individuals identified them-
selves on the record, he explained that he lost track
of the individuals' identities because they quickly
offered their names. The photographer took photo-

graphs of the small group of individuals involved in the hearing. After the group left the courtroom at the hearing's conclusion, the photographer located the reporter outside the courtroom and inquired which individual was DeHart,[8] to which the reporter responded "the guy on the right."[9] The photographer explained that he assumed the reporter meant the right side from the photographer's perspective in the jury box.[10] According to the photographer, he usually inquired of photograph subjects their identities, but did not in this case because the involved parties quickly left the courtroom after the hearing. The reporter later prepared the text of the article, but according to defendant's operating procedures had no involvement in the selection of the accompanying photograph. The photographer and his senior editor explained that they selected the photograph of plaintiff to accompany the article regarding DeHart because they believed that the photograph in fact depicted DeHart.[11]

We find no basis in the instant record from which a rational jury could find actual malice by clear and convincing evidence. The record contains absolutely no evidence or inference reflecting any knowledge by defendant that the photograph it printed with the article regarding DeHart depicted any individual other

---

[8] The photographer stated that he did not speak with the reporter before the court hearing because the reporter arrived somewhat late.

[9] The photographer also recalled that the reporter might have mentioned a brown jacket, but according to the photographer two other individuals also wore brown jackets.

[10] The photographer and reporter observed the hearing from different vantage points within the courtroom, and neither was aware of the other's presence during the hearing.

[11] The photographer prepared the inaccurate caption that identified plaintiff's photograph as DeHart.

than DeHart. While a jury reasonably might have found that the photographer made insufficient efforts to verify DeHart's identity, insufficient investigation does not establish the necessary reckless disregard of the truth by defendant. *Ireland, supra.*

We conclude that the trial court properly granted defendant summary disposition of plaintiff's complaint pursuant to MCR 2.116(C)(10).[12] This result must prevail in this case involving an erroneous statement of fact concerning a public official because "the communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them," and because punishment of the inevitable erroneous statement "runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press." *Gertz v Robert Welch, Inc*, 418 US 323, 340, 345; 94 S Ct 2997; 41 L Ed 2d 789 (1974).

Affirmed.

---

[12] Although the trial court's order did not separately discuss plaintiff's false light invasion of privacy claim, this claim was properly dismissed according to the same analysis we set forth regarding plaintiff's defamation claim. *Collins, supra* at 36-37 (noting that the First Amendment limitations applicable to defamation claims also applied to the plaintiff's claim of false light invasion of privacy).