# STATE OF MICHIGAN

# COURT OF APPEALS

ALFONSO IGNACIO VIGGERS,

      Plaintiff-Appellant,

v

AL-AZHAR F. PACHA and ALPAC, INC.,

      Defendants-Appellees,

and

JOHN DOE,

      Defendant.

UNPUBLISHED
August 15, 2017

No. 334522
Washtenaw Circuit Court
LC No. 15-001193-CZ

Before: CAVANAGH, P.J., and METER and M. J. KELLY, JJ.

PER CURIAM.

Plaintiff, Alfonso Viggers, appeals as of right the trial court's order granting summary disposition in favor of defendants, Al-Azhar Pacha and ALPAC, Inc. Because we conclude that the trial court did not err, we affirm.

## I. BASIC FACTS

Viggers, a citizen of Mexico and Spain, began working for ALPAC in 2007 as a computer programming and database administrator contractor. He resigned from ALPAC in 2012, but he returned in January 2013. Viggers was assigned to work at the University for the duration of his employment with ALPAC. This case arises out of statements and actions made by Pacha, the owner and president of ALPAC, that resulted in the termination of Viggers's employment from ALPAC and the rescission of a job offer from the University of Michigan.

In April 2014, Pacha initiated the process to sponsor a green card on Viggers's behalf. Sometime after, Viggers was notified that the University wished to hire him as a permanent employee. A University employee asked Pacha to allow Viggers to apply for the permanent position, so Pacha released Viggers from his non-compete agreement, thereby authorizing him to pursue a permanent position with the University. In December 2014, the University extended a job offer to plaintiff, which plaintiff accepted.

-1-

On March 26, Viggers told Pacha that he had verbally accepted the position with the University. The next day, Pacha's immigration lawyer advised him that if Viggers was no longer intending to work for ALPAC, "it may be deemed either a misrepresentation or fraud for [Pacha] to continue to sponsor him for a green card." At that point, Viggers was given two options; he could move forward with a H-1B visa with the University or he could pursue the green card with Pacha and the University would repost Viggers's position.[1]

In June 2015, Viggers and Pacha continued to discuss Viggers's green card process. In an e-mail sent on June 20, 2015, Viggers stated:

> I truly think the optimal solution for both of us is to file the Immigration form(s) and thereafter decline the position at the UofM, [sic] whenever the latter fits you best. I can understand you don't care about my Green Card. However, for you it should be a matter of being practical and thinking in terms of cash flows –those from the invoice I originate—, rather than procuring some kind of revenge. If you're up for making this work, then that will be great; if not, what goes around comes around.

On July 1, 2015, Viggers again sent an e-mail to Pacha relating to his green card process. In the e-mail he stated:

> It is regrettable how you've spent more effort hindering this process than what it would entail filing forms []. You wouldn't have wished to endure such frustrating hurdles in your own immigration process. As I told you recently, what goes around comes around.

Pacha interpreted the e-mails as direct threats. He was concerned that Viggers, as a disgruntled employee, might sabotage the University's systems and that ALPAC would be held liable for Viggers's actions. Pacha did not, however, show anyone the e-mails, and he did not act immediately because he wanted to decide whether to terminate Viggers's employment.

About 20 days after receiving the second e-mail, Pacha e-mailed three University employees requesting a meeting about Viggers. He indicated in the e-mail that Viggers was not pleased about the green card process, which had been halted on the advice of Pacha's immigration lawyer. And he stated that in response to the green card decision he had "received direct threats from" Viggers. Pacha requested a meeting with the University employees to discuss Viggers's employment options. He explained in his deposition that he requested the meeting because he had decided to terminate Viggers's employment and he wanted to inform the

---

[1] According to Viggers, he was notified in late April 2015 that the University suspended the visa process due to accusations made by Viggers's stepmother. Viggers believed that his stepmother's statements contributed to the University's decision to rescind the job offer because she damaged his reputation to the extent that when Pacha made accusations involving him, the University believed those accusations without any further proof.

University that Viggers would no longer be reporting to his job assignment. Pacha also wanted to discuss a suitable termination date to avoid delays in any of the University's projects.

At the meeting with the University employees, Pacha informed them that he was terminating Viggers's employment because he was afraid that Viggers "would do something to impact [ALPAC's] business with [the University] and [ALPAC] would be held liable if something went wrong while [plaintiff] was [an ALPAC] employee." One of the University employees testified that although he did not remember the exact language used during the meeting, he recalled that Pacha explained that Viggres was unhappy with ALPAC "dropping the green card process" and that Viggers made an additional threat that once he was employed with the University, "there would be some kind of payback undefined." Another University employee recalled Pacha explaining that once Viggers was a permanent employee of the University, he would have the ability to cause Pacha and ALPAC harm.

On July 30, Pacha notified Viggers that his employment with ALPAC was terminated. Pacha explained that he decided to terminate Viggers based on the e-mails Viggers sent to him on June 20 and July 1. Thereafter, Pacha returned to the University and collected his personal belongings. He asked whether employment with the University was still available and was told to contact one of two people (one of whom was the human resources manager).

On July 31, Viggers received a letter stating that the job offer with the University had been rescinded. Viggers filed a complaint against Pacha and ALPAC alleging wrongful termination, tortious interference in a business relationship and expectancy, defamation, and conspiracy. Viggers contended that Pacha falsely accused him of threats so the University would rescind its offer of employment because Pacha realized he would no longer collect revenue from Viggers's work.

Viggers filed motions for summary disposition under MCR 2.116(C)(8) and (10) involving all of his claims. However, the trial court denied Viggers's motions and granted summary disposition in favor of Pacha and ALPAC under MCR 2.116(I).

## II. SUMMARY DISPOSITION

## A. STANDARD OF REVIEW

Viggers argues that the trial court erred by granting summary disposition in favor of Pacha and ALPAC on his claims for defamation, tortious interference with a business expectancy, and wrongful termination. We review de novo a trial court's ruling on a motion for summary disposition. *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009). Under MCR 2.116(C)(10), a party may move for dismissal on the ground that "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter

of law." When reviewing a motion brought pursuant to MCR 2.116(C)(10),[2] this Court "must consider the pleadings, affidavits, depositions, admissions, and any other documentary evidence in favor of the party opposing the motion." *Baker v Arbor Drugs, Inc*, 215 Mich App 198, 202; 544 NW2d 727 (1996).

## B. ANALYSIS

### 1. DEFAMATION

Viggers contends that Pacha committed defamation per se. Accusations of criminal activity are considered "defamation per se" under the law and so do not require proof of damage to the plaintiffs reputation. *Tomkiewicz v Detroit News, Inc*, 246 Mich App 662, 667 n 2; 635 NW2d 36 (2001). See also MCL 600.2911(1) ("[W]ords imputing the commission of a criminal offense" "are actionable in themselves."). However, although Pacha told the University employees that Viggers had made threats, those threats related to Pacha's business, and the record does not show that Pacha accused Viggers of any specific criminal activity. Consequently, Viggers cannot establish a claim of defamation per se.

In addition, "[a]n employer has the qualified privilege to defame an employee by making statements to other employees whose duties interest them in the subject matter." *Gonyea v Motor Parts Fed Credit Union*, 192 Mich App 74, 78-79; 480 NW2d 297 (1991). Likewise, an "employer has a qualified privilege to divulge information regarding a former employee to a prospective employer." *Id*. at 79. "The elements of a qualified privilege are (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only." *Prysak v Polk Co*, 193 Mich App 1, 15; 483 NW2d 629 (1992). "A plaintiff may overcome a qualified privilege only by showing that the statement was made with actual malice, i.e., with knowledge of its falsity or reckless disregard of the truth." *Id*. "General allegations of malice are insufficient to establish a genuine issue of material fact." *Id*.

The trial court properly found that Pacha's allegedly defamatory communications with the University were subject to a qualified privilege. Pacha made the statements after receiving two e-mails from Viggers that he perceived as a threat. The language used in the e-mails—"what goes around comes around"—coupled with Viggers obvious dissatisfaction with the green card process give rise to a reasonable inference that Viggers was, in fact, directing a threat at Pacha. Further, in his deposition, Pacha explained that he believed Viggers might use his position at the University to cause liability for Pacha or cause his business harm, and he explained the basis for that fear. Pacha's statements to the University were also limited. He only generally stated that Viggers had threatened him—he did not show the e-mails to the employees. Further, the reason Pacha made the disclosure was for a proper business purpose: he was

---

[2] Where, as here, the trial court grants a motion for summary disposition brought under MCR 2.116(C)(8) and (C)(10), and it is clear that the trial court looked beyond the pleadings, this Court "will treat the motions as having been granted pursuant to MCR 2.116(C)(10)." *Kefgen v Davidson*, 241 Mich App 611, 616; 617 NW2d 351 (2000).

terminating Viggers's employment with ALPAC, which meant that Viggers would no longer be reporting to the University as an employee of ALPAC. Pacha also explained that he wanted to avoid delaying any University projects as a result of his decision to fire Viggers. In addition, Pacha limited his communications regarding the perceived threats to the proper employees within the University, i.e. two individuals who were Viggers's supervisors at the University, and the human resources manager, who was involved in employment decisions, including decisions involving Viggers. Based on the foregoing, the trial court properly concluded that Pacha's communications were subject to a qualified privilege.

Viggers asserted that he overcame the qualified privilege by providing evidence of actual malice. In support, he contends that Pacha acted with malice as demonstrated by the delay in communicating the alleged threats to the University, inconsistencies in the testimony about the words used during the meeting with the University employees, and Pacha's delay in discovery matters. Those facts, however, even viewed in Viggers's favor, are insufficient to establish actual malice. Pacha's interpretation of the statements in Viggers's e-mails is not unreasonable under the circumstances. In other words, Viggers cannot establish that Pacha's communications with the University were made "with knowledge of [the statement's] falsity" or with a reckless disregard for the truth of the statements. See *id*. Accordingly, because the statements were protected by a qualified privilege and because Viggers cannot establish actual malice, the trial court did not err by summarily dismissing the defamation claim.

## 2. TORTIOUS INTERFERENCE WITH A BUSINESS RELATION

Viggers's tortious interference with a business relation claim was based on Pacha's communications with the University employees involving Viggers's threats. It is, therefore, a tortious interference claim based on a defamatory statement. See *Lakeshore Comm Hosp, Inc v Perry*, 212 Mich App 396, 401; 538 NW2d 24 (1995) ("Tortious interference with business relations may be caused by defamatory statements."). "As with defamation actions, where the conduct allegedly causing the business interference is a defendant's utterance of negative statements concerning a plaintiff, privileged speech is a defense." Here, as noted above, Pacha's statements were protected by a qualified privilege and Viggers failed to overcome the privilege by establishing that the statements were made with actual malice. Accordingly, the trial court properly granted summary disposition in favor of Pacha and ALPAC on Viggers's tortious interference claim.

## 3. WRONGFUL TERMINATION

Finally, Viggers asserts that the trial court erred in granting summary disposition in favor of Pacha and ALPAC on his wrongful termination claim. Viggers was an at-will employee. "In general, in the absence of a contractual basis for holding otherwise, either party to an employment contract for an indefinite term may terminate it at any time for any, or no, reason." *Suchodolski v Mich Consol Gas Co*, 412 Mich 692, 694-695; 316 NW2d 710 (1982). "However, an exception has been recognized to that rule, based on the principle that some grounds for discharging an employee are so contrary to public policy as to be actionable." *Id*. "Most often these proscriptions are found in explicit legislative statements prohibiting the discharge, discipline, or other adverse treatment of employees who act in accordance with a statutory right or duty." *Id*. Here, Viggers contends that Pacha violated MCL 750.351 because he "demanded

[that he] decline his prospective position with the University as a prerequisite for resuming the Green Card process." MCL 750.351 states in relevant part:

> Any employer or agent or representative of an employer or other person having authority from his employer to hire, employ, or direct the services of other persons in the employment of said employer, who shall demand or receive directly or indirectly from any person when in the employment of said employer, any fee, gift or other remuneration or consideration, or any part or portion of any tips or gratuities received by such employee while in the employment of said employer, in consideration or as a condition of such employment or hiring or employing any person to perform such services for such employer or of permitting said person to continue in such employment is guilty of a misdemeanor.

However, even though Pacha asked that Viggers decline the job offer from the University before he would continue Viggers's green card process, there was no evidence that Viggers was required to do anything to remain employed at ALPAC. Consequently, Viggers did not show that Pacha and ALPAC violated MCL 750.351,[3] nor can he show that his termination was in violation of public policy. The trial court did not err in granting summary disposition in favor of Pacha and ALPAC on Viggers's claim for wrongful termination.

Affirmed. As the prevailing parties, Pacha and ALPAC may tax costs. MCR 7.219(A).

/s/ Mark J. Cavanagh
/s/ Patrick M. Meter
/s/ Michael J. Kelly

---

[3] We further note that even if Viggers could establish a violation under MCL 750.351, he would not be entitled to relief in the circuit court. Viggers's exclusive remedy for a violation of MCL 750.351 exists under the wages and fringe benefits act (WFBA), MCL 408.471 *et seq*. See *Cork v Applebee's of Mich, Inc*, 239 Mich App 311, 318; 608 NW2d 62 (2000) (stating that the plaintiff's clam of a public policy violation under MCL 750.351 "was properly dismissed because that statute is, in effect, identical to subsection 8(1) of the WFBA, MCL 408.478(1), and . . . the WFBA provides the exclusive remedy for that alleged violation"). Viggers was, therefore, required to exhaust his administrative remedies before filing a claim in the circuit court. *Id*. at 317.