*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SF,

Petitioner-Appellee,

v

EB,

Respondent-Appellant.

UNPUBLISHED
June 16, 2025
9:55 AM

No. 367196
Clinton Circuit Court
Family Division
LC No. 2023-031274-PH

Before: BORRELLO, P.J., and REDFORD and PATEL, JJ.

PER CURIAM.

Respondent appeals by right the trial court's order modifying an ex parte personal protection order (PPO) against him. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

Respondent was a corrections officer for the Michigan Department of Corrections (MDOC). On his personal Facebook page, he posted two internal videos from his facility, both showing a prisoner suddenly punching him. He expressed happiness that some coworkers checked on him but complained that the director, warden, and assistant deputy warden did not; he speculated it might be because they viewed him as a disgruntled, malicious, or reputation-damaging employee. Following that post, the MDOC issued a Social Media Policy directive that effectively prohibited employees from disparaging the MDOC or its staff and posting "information concerning official business" or "information obtained through their professional duties and responsibilities." After the MDOC introduced the policy, respondent reposted the internal videos on Facebook.

Petitioner worked as an Internal Affairs investigator for the MDOC. After respondent reposted the videos, petitioner investigated his social media activity. Petitioner, respondent, and respondent's union representative participated in an interview regarding respondent's social media activity, which respondent audio recorded. Respondent testified he found the interview inquisitive, intimidating, and threatening. Shortly after the interview, respondent contacted his attorney and filed a federal lawsuit against petitioner, posting the recording of the interview on YouTube. Respondent was issued a "stop order," which he promptly posted on Facebook.

Contemporaneously, someone—respondent denies it was him—posted a meme image of the character Woody from the movie *Toy Story* holding a handgun with the caption "S***S [sic] GONNA GET REAL." Accompanying the post was a statement that the gun was not real and a request not to misinterpret it as a threat to engage in gun violence. Respondent's name appears at the top of the post. Part of, or associated with, the meme post was a list of individuals, including petitioner, who would be the subject of "informational Pickets" "when Policy Directive for 'Use of Social Media' policy no longer pertains to me as an Ex Corrections Officer." The list post does not expressly identify itself as having been made by respondent, but it does state that "I have been reasonably respectfull [sic] in my Postings, without Name calling and only posting conservatively worded responses and Posts!!!" and promises that the "Kid Gloves will come off." The post concludes that "[w]hen I no longer have these self imposed restraints, tactfully subdued posts due to my still being employed by the State and current Lawsuit...STAY TUNED FOR MY TOTAL LACK OF RESTRAINT!!!!" Petitioner testified that he personally took a screenshot of the posts from respondent's Facebook page after he was contacted by the MDOC's police chaplain to check on petitioner's well-being. Michigan State Police questioned respondent about the post, and respondent posted on Facebook that the police "wanted to question me about a recent Facebook Post!!!" and that he had repeatedly "invoked his Fifth Amendment right to remain silent."

In 2023, petitioner was apprehended and subsequently charged with multiple offenses, culminating in a conviction through a plea agreement. Respondent attended a pretrial hearing in the aforementioned criminal case to document the proceedings and disseminate the information on Facebook. He acknowledged that part of his motivation stemmed from concerns about an individual he found troubling, to publicly reveal that petitioner was facing criminal charges. Additionally, respondent maintained that petitioner was a "public official." Respondent proceeded to record petitioner entering the courthouse and followed him inside. Both parties have differing accounts of the events that occurred within the courthouse. Petitioner claims that respondent followed him within three feet, occupied a seat at his table, and hovered over him. Conversely, respondent contested this assertion, testifying that he sat at petitioner's table due to a lack of available seating. After the hearing, petitioner took refuge in a restroom for fifteen minutes while respondent waited by the exit to monitor his departure from the courthouse. Petitioner alleges that respondent recorded him as he exited and subsequently published this recording on Facebook; however, respondent admitted to waiting at the exit but denied recording petitioner as he left. Respondent posted a video of the petitioner's arrival, and commented, "Someone doesn't look too happy!!!" He additionally published photographs of petitioner and his spouse, along with other personally identifiable information related to petitioner.

The day after respondent shared the video of petitioner's courthouse arrival, petitioner filed an ex parte petition for a personal protection order (PPO), outlining respondent's Facebook posts and his observations regarding respondent's presence at the pretrial hearing. In turn, respondent sought to nullify the PPO, impose sanctions on petitioner, and issue a subpoena to the courthouse for surveillance video footage he argued would undermine petitioner's credibility. Central to respondent's argument was the assertion that he engaged in activities protected by the Constitution, contending that petitioner was improperly attempting to infringe upon his freedom of speech. The trial court partially agreed with respondent's view, concluding that an original PPO contained several provisions that were either improper or excessive. While the trial court acknowledged respondent's right to attend public court hearings and recognized that his conduct was constitutionally protected to a degree; nevertheless, it found that he had "crossed over that line in

some respects" and had engaged in harassing and intimidating behavior. Consequently, the trial court modified the PPO's duration, upholding it in part, and prohibiting respondent from following petitioner, appearing at petitioner's residence, or approaching or confronting petitioner in public. The modified PPO expired while the appeal was pending.

## II. MOOTNESS

From the beginning, we note two important facts relevant to our review of this matter. First, petitioner did not provide any written materials to this Court, and second, most of respondent's challenges are moot.

Mootness is a question of law that is considered de novo and as a threshold issue that must be addressed before any substantive issues in a case. *Can IV Packard Square, LLC v Packard Square, LLC*, 328 Mich App 656, 661; 939 NW2d 454 (2019). "An issue is moot when an event occurs that renders it impossible for the reviewing court to grant relief," and this Court generally "does not consider matters that have become moot." *Associated Builders and Contractors of Mich v Dep't of Technology, Management, and Budget*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 363601); slip op at 5. "Entry of an improperly issued PPO into LEIN presents a live controversy" even if the PPO has since expired. *HMM v JS*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367586); slip op at 4. However, "any of the challenges respondent brings to the *extensions* of the PPO, as distinct from its initial entry, *are* moot" if the respondent cannot articulate any collateral harm from the extension following its expiration. *Visser v Visser*, 299 Mich App 12, 15-16; 829 NW2d 242 (2012), aff'd in relevant part and vacated in part on other grounds 495 Mich 862 (2013).

As previously noted, the PPO has lapsed. In his appeal, respondent failed to allege any ongoing collateral consequences stemming from the extension of the PPO. Several of respondent's assertions do not distinctly indicate whether he is contesting the validity of the original PPO or the trial court's extension of said order. For clarity and completeness, we shall assume he is disputing the original PPO, as its validity pertains to his argument in favor of sanctions. Nonetheless, as will be elaborated upon, at least some of the provisions in the original PPO were not erroneous; therefore, respondent's challenges to any additional provisions pertain more to the scope of the PPO rather than its validity, ultimately rendering them moot.[1]

## III. ERRORS BY THE TRIAL COURT

Respondent accurately identifies three specific errors made by the trial court. However, after reviewing the context and circumstances surrounding this case, it is evident that none of these errors are significant enough to justify a reversal of the trial court's decision. Each error, while noted, falls short of impacting the overall outcome.

First, respondent correctly observes that the trial court plainly violated MCR 3.707(A)(2), and, although respondent does not cite it, also MCL 600.2950a(14). *Patterson v Beverwyk*, 320

---

[1] Based on this conclusion, we need not consider respondent's specific challenge to whether the trial court erred by prohibiting respondent from appearing at petitioner's residence.

Mich App 670, 683; 922 NW2d 904 (2017). The rule and the statute both require the trial court to hold a hearing on a timely motion to terminate a PPO within 14 days of filing the motion. The time limit is presumably provided to protect respondent's rights, so the time limit is not merely directory. *In re Forfeiture of Bail Bond*, 496 Mich 320, 327-339; 852 NW2d 747 (2014). Respondent filed his motion to terminate the PPO on July 14, 2023, and the trial court held the hearing on July 31, 2023. Therefore, the hearing was held 17 days after respondent filed his motion. However, because the PPO has expired and its extension is moot, and respondent acknowledges that he does not know what relief this Court could grant him for this violation, this error is moot.

Second, the trial court failed to rule on or address respondent's motion to subpoena surveillance videos from the courthouse. Therefore, the trial court abused its discretion by failing to exercise it when called upon. *Hein v Hein*, 337 Mich App 109, 115; 972 NW2d 337 (2021). However, under MCR 2.613(A):

> An error in the admission or the exclusion of evidence, an error in a ruling or order, an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice.

"To overcome this rule, a party must show that an error was prejudicial such that a failure to grant relief would be inconsistent with substantial justice, i.e., that it is more likely than not the error affected the case's outcome." *In re Miller Minors*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 364195); slip op at 5. Substantial justice does not require reversal for two reasons. First, it is purely speculative whether the videos, if they even existed, would have supported respondent's position or (as petitioner testified) would have supported petitioner's position. Second, respondent does not argue that the trial court would have been empowered to issue any such subpoena, and he seeks guidance, but the courts are not litigants' research assistants. *Platt Convenience, Inc v Ann Arbor*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 359013); slip op at 7.

Third, the trial court failed to rule on or address respondent's request for sanctions, again constituting an abuse of discretion by failing to exercise discretion when called upon to do so. *Hein*, 337 Mich App at 115. Substantial justice does not require remand to the trial court because respondent's argument in support of sanctions effectively depends on the original PPO being invalid, which, as we will discuss *infra*, it was not.

IV. CONSTITUTIONALLY PROTECTED ACTIVITY

Respondent's central argument is that he engaged in activities that are constitutionally protected and thus cannot be classified as forbidden or enjoinable in a PPO. He contends that, due to this constitutional protection, his actions should not be subject to prohibition. However, the trial court found that respondent overstepped the boundaries established by law, leading to the trial court's decision to grant a PPO. Hence, despite respondent's claims, the court held that certain actions taken by respondent fell outside the realm of constitutional protection.

## A. GENERAL PRINCIPLES

"This Court reviews for an abuse of discretion a trial court's decision whether to issue a PPO." *PC v JLS*, 346 Mich App 233, 239; 12 NW3d 29 (2023). To the extent a discretionary decision implicates constitutional issues, the decision is reviewed de novo as a question of law. *People v Samuels*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket No. 164050); slip op at 4. When deciding whether to issue a PPO, the trial court should consider "the totality of the circumstances." *Patterson*, 320 Mich App at 688. The trial court is not limited to the petition and must consider any other proffered evidence. *Lamkin v Engram*, 295 Mich App 701, 711; 815 NW2d 793 (2012).

"[C]onduct that is constitutionally protected or serves a legitimate purpose cannot constitute harassment or, derivatively, stalking." *Nastal v Henderson & Assoc Investigations, Inc*, 471 Mich 712, 723; 691 NW2d 1 (2005). The First Amendment grants a constitutional right to speak publicly regarding matters of public concern. *Lindke v Freed*, 601 US 187, 196-197; 144 S Ct 756; 218 L Ed 2d 121 (2024); *Locricchio v Evening News Ass'n*, 438 Mich 84, 119; 476 NW2d 112 (1991). There is also a constitutional right to attend criminal trials. *Richmond Newspapers v Virginia*, 448 US 555, 563-564, 573-574; 100 S Ct 2814; 65 L Ed 2d 973 (1980). " '[C]onduct that serves a legitimate purpose' means conduct that contributes to a valid purpose that would otherwise be within the law irrespective of the criminal stalking statute." *Nastal*, 471 Mich at 723.

## B. MATTER OF PUBLIC CONCERN

Although reporting on crimes is a matter of public concern, petitioner was not a "public official" or a "public figure," but rather a mere public employee, which attenuates the extent to which petitioner's criminal charges are a matter of public concern.

Publication of crimes is a matter of legitimate public concern. *Swickard v Wayne Co Medical Examiner*, 438 Mich 536, 550-551; 475 NW2d 304 (1991). However, that does not end the inquiry. "[T]he First Amendment affords the highest protection to public speech about public figures," and when the respondent in a PPO proceeding contends that the PPO is prohibiting "constitutionally protected speech relating to a matter of public concern, it must be determined whether the postings are intended solely to cause conduct that will harass a private victim in connection with a private matter or whether the publication of the information relates to a public figure and an important public concern." *Buchanan v Crisler*, 323 Mich App 163, 188-189; 922 NW2d 886 (2018). At least in the defamation context, there is a constitutional privilege to make defamatory statements about public officials that does not extend to mere public employees. *Tomkiewicz v Detroit News, Inc*, 246 Mich App 662, 667-669; 635 NW2d 36 (2001). Although petitioner has not alleged that respondent defamed him, these cases illustrate the principle that the rights guaranteed by the First Amendment are nuanced.

Not all public employees are public officials. *Tomkiewicz*, 246 Mich App at 669. To be a public official, a governmental employee must have at least the appearance of "substantial responsibility for or control over the conduct of governmental affairs" and the employee's position must have "such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in

the qualifications and performance of all government employees." *Id*. (quotation marks and citation omitted). In *Tomkiewicz*, this Court held that a police officer, even a mere patrol officer at the bottom of the department's hierarchy, constitutes a "public official" for First Amendment purposes because a police officer is visible to the public and has significant power to harm citizens and society if that power were to be abused. *Id*. at 667-673. Here, petitioner was an Internal Affairs investigator, and there is no evidence that he had any influence on policy decisions, formal interaction with members of the public, or the unilateral power to do anything other than gather information. Respondent offers no reason to conclude, and no such reason is apparent, that petitioner's position was "one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." *Tomkiewicz*, 246 Mich App at 669 (quotation marks and citation omitted). Therefore, petitioner does not appear to have been a "public official," but rather a mere public employee.

Petitioner could conceivably be a "public figure," but "[p]ublic-figure status must exist before information about the person is disclosed to the public and not because of the notoriety arising because such information is made public." *Buchanan*, 323 Mich App at 189-190 (quotation marks and citations omitted). Given that respondent had already posted the gun meme and threatened to show no restraint toward petitioner, along with his own admission that he was partly motivated by his stated belief that petitioner was causing him trouble, it's challenging to determine whether any notoriety attached to petitioner's crimes was solely the result of respondent's conduct. Respondent cannot enhance his own rights by turning the petitioner into a public figure. This tactic would allow respondent to engage in behavior that is normally restricted if petitioner were considered a private individual. In summation, respondent has failed to establish that petitioner holds a status above that of an ordinary governmental employee. Moreover, respondent has not proven that the crimes attributed to petitioner carry greater significance to the public than those committed by regular private citizens.

## C. RIGHT TO ATTEND COURT HEARINGS

Respondent argues that he has a constitutionally protected right to attend court hearings, but that right actually only extends to trials and not to the pretrial hearing he attended.

A plurality of United States Supreme Court Justices held that the public has a right to attend criminal *trials*, but it also held that there is no analogous right to attend pretrial proceedings. *Richmond Newspapers v Virginia*, 448 US 555, 563-564, 573-574; 100 S Ct 2814; 65 L Ed 2d 973 (1980). In Michigan, there is a longstanding common-law and statutory right to attend courtroom proceedings, but that right is not absolute, and, consistent with precedent from the United States Supreme Court, any constitutional right to attend trials does not extend to *pretrial* proceedings. *In re Midland Publishing Co, Inc*, 420 Mich 148, 160-175; 362 NW2d 580 (1984). Indeed, pretrial publicity can potentially harm a defendant's ability to obtain a fair trial. *Booth Newspapers, Inc v Midland Circuit Judge*, 145 Mich App 396, 403; 377 NW2d 868 (1985); *United States v Koubriti*, 307 F Supp 2d 891, 897 (ED Mich, 2004) and the cases cited therein. Under MCL 600.1420, "[t]he sittings of every court within this state" must generally be public. However, caselaw establishes that there is no *constitutional* right to attend court hearings other than actual trials. Here, respondent attended a pretrial hearing. Although there is a common-law and statutory right

to do so, it is not a *constitutionally* protected right, and respondent's insistence otherwise is clearly erroneous.

However, regardless of the extent of constitutional protections for attending court hearings, respondent failed to produce any evidence that he was not permitted to attend any court proceedings. Rather, as is evident throughout his briefing, respondent merely speculates that he must have been denied a constitutional right.

## D. LEGITIMATE PURPOSE

Respondent contends that his actions served a legitimate public purpose; however, the record evidence strongly suggests otherwise, the most significant fact being that respondent began to target petitioner, explicitly threatening to do so without restraint prior to when petitioner's crimes became public knowledge. Respondent maintains the narrative that petitioner sought to prevent him from embarrassing himself, implying that petitioner regarded the PPO as "a tool to relieve the worried soul of a criminally charged internal affairs officer." However, the record is devoid of any evidence that petitioner ever endorsed such a narrative and, in fact, testified that revealing his criminal proceedings was simply a matter of managing the circumstances he was already facing. Notably, petitioner contended that he was genuinely afraid of respondent, particularly in light of the gun meme post—that respondent created prior to petitioner's arrest.

Courts look beyond superficialities when determining whether a PPO respondent's conduct serves a legitimate purpose. See *Hayford v Hayford*, 279 Mich App 324, 333; 760 NW2d 503 (2008). Even if attending a court hearing is a protected right, it has long been established in the First Amendment context that the government may impose constraints on the time, place, and manner of speech, so long as any such restrictions are neutral toward the substantive content of that speech. *RAV v City of St. Paul*, 505 US 377, 385-386; 112 S Ct 2538; 120 L Ed 2d 305 (1992). Respondent's arguments ignore the meaningful difference between attending a court hearing and relentlessly following close behind someone inside a courthouse while they are trying to confer with their attorney. The trial court concluded that it could not enjoin respondent from appearing at the courthouse, but respondent offered no reason—and none is apparent—why the trial court could not enjoin him from following petitioner around, even if that following around happened inside a courthouse. Unfortunately, respondent fails to grasp the relatively simple concept that merely because a person might have legitimate business in a courthouse does not mean any action the person takes within the courthouse is necessarily constitutionally protected conduct. *People v Kieronski*, 214 Mich App 222, 232-233; 542 NW2d 339 (1995).

## E. CONFRONTING PETITIONER

Respondent contends that he holds a constitutionally protected right to not only observe or track petitioner in public but also to approach or confront him directly. However, he does not provide relevant case law to substantiate this assertion, most likely because there is none. Rather, the current body of case law contradicts his claim, indicating that he does not possess the asserted right.

"A person has the right to freedom of speech under both the federal and state Constitutions," but "a person's right to free speech must be understood in light of another person's

interest in being left alone." *ARM v KJL*, 342 Mich App 283, 297, 299; 995 NW2d 361 (2022). The United States Supreme Court has recognized that the right to speech must be balanced against the right of people to decline unwanted efforts at communication. *Hill v Colorado*, 530 US 703, 715-718; 120 S Ct 2480; 147 L Ed 2d 597 (2000). The statement underscores that, from a legal perspective, even if respondent encounters petitioner in a public environment, the act of confronting him does not fall under constitutional protections. Jurisprudence reinforces this understanding, suggesting that mere proximity to petitioner does not afford respondent any constitutional rights to initiate confrontation. Hence, the right to confront someone, in this specific context, lacks any support under constitutional law.

## F. TOTALITY OF THE CIRCUMSTANCES

As previously indicated, when respondent's conduct is evaluated within its contextual framework, it becomes evident that not all his actions were constitutionally safeguarded; thus, the trial court was not constrained from issuing a PPO against such conduct.

Reporting on a government employee, such as petitioner, is subject to a lesser degree of protection compared to reporting on a public official or figure; however, it is important to note that some level of protection does exist. While there is no constitutionally guaranteed right to attend pretrial hearings, such as the one attended by respondent, there exists at least a common-law right along with statutory provisions that accommodate such attendance. Reporting on criminal activities undeniably constitutes a matter of public interest, although respondent has failed to demonstrate that petitioner's alleged crimes hold more significant public interest than crimes attributed to any other individual. Consequently, respondent's actions do not receive the robust protection he claims, though superficially, such actions may not be entirely devoid of protection.

Nevertheless, it is imperative to highlight that respondent began targeting petitioner prior to the disclosure of petitioner's alleged criminal activities. Respondent denied authorship of the meme post, yet the trial court deemed him lacking in credibility. However, it is evident from the record that respondent issued overt threats directed at petitioner, disseminated photographs of petitioner and his family, and seems to have taken measures to carry out his unrestrained intention to target petitioner. When viewed within the appropriate context, respondent's activities suggest that the arrest of petitioner and the associated criminal charges provided respondent with a pretext to inflict harm upon him, whom respondent admittedly blames for contributing to the enforcement of a policy instituted by an employer against whom respondent already held grievances. Essentially, respondent had a malicious intent disguised as a virtuous cause. Additionally, even if respondent had a right to access the courthouse, his actions go far beyond anything necessary for reporting on the progression of the case. Ultimately, there exists no constitutionally protected right for respondent to confront petitioner in the manner he utilized.

After reviewing all of the evidence, the trial court did not err in concluding that, while some of respondent's conduct may have constitutional protection, respondent transgressed into areas of illegitimate and unprotected harassment and intimidation that served no legitimate purpose.

## V. TWO OR MORE ACTS

Respondent argues that an activity can only be enjoined by a PPO if there were two or more noncontiguous and distinct such acts, and even if his conduct at the courthouse was not protected, it was only a single act. Respondent overlooks that "harassment" may include either repeated *or* continuing unconsented contact. Because respondent's conduct as described in the petition and as the trial court accepted after the hearing could reasonably be understood as continuing unconsented contact for no legitimate purpose, the trial court did not err by issuing the original PPO.

The statutory definition of "harassment" also includes "*continuing* unconsented contact" MCL 750.411h(d) (emphasis added). In contrast, MCL 750.411h(d) specifies "repeated *or* continuing" (emphasis added). The word "or" generally connotes alternatives. *People v Parkinson*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 362683); slip op at 7-8. This Court has held that a single incident does not suffice under MCL 600.2950a. *CNN v SEB*, 345 Mich App 151, 161-162; 4 NW3d 759 (2023). In *CNN*, the Court specifically held that a "single, nonthreatening comment" could not constitute harassment. *Id*. at 162-163. It also held that other conduct that the respondent engaged in during the same encounter might potentially have constituted harassment if the trial court had considered that other conduct. *Id*. at 164. This Court did not expressly address the possibility of "continuing" conduct, but the latter observation suggests the possibility that a single encounter can constitute harassment if it is of a lengthy duration and a respondent commits multiple improper acts within that encounter. Respondent's behavior at the courthouse, as outlined by petitioner and acknowledged by the trial court, represents a case of persistent, unconsented contact. This assertion is particularly evident considering that petitioner chose to conceal himself for fifteen minutes in a bathroom while awaiting respondent's departure. Hence, regardless of whether respondent engaged in two or more acts, he participated in ongoing unconsented contact which clearly exceeded what is constitutionally protected. In conclusion, the record plainly reveals that respondent's conduct was harassment of petitioner that continued over a period of time. Accordingly, the trial court did not err by issuing the original PPO. Therefore, all of respondent's other challenges are moot.

Affirmed. No costs are awarded. MCR 7.219(A).

/s/ Stephen L. Borrello
/s/ Sima G. Patel