# Court of Appeals, State of Michigan

# ORDER

Robert J. Zabriskie v American Civil Liberties Union of Michigan

Docket No. 356570

LC No. 20-008227-CZ

Amy Ronayne Krause
Presiding Judge

Michael J. Kelly

Christopher P. Yates
Judges

The motion for reconsideration is GRANTED, and this Court's opinion issued June 30, 2022, is hereby VACATED. A new opinion is attached to this order.

_____
Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

August 18, 2022
Date

_____
Chief Clerk

*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ROBERT J. ZABRISKIE,

        Plaintiff-Appellee,

v

AMERICAN CIVIL LIBERTIES UNION OF
MICHIGAN, MIRIAM AUKERMAN, ELAINE
LEWIS, and ANTHONY GREENE,

        Defendants-Appellants.

UNPUBLISHED
August 18, 2022

No. 356570
Kent Circuit Court
LC No. 20-008227-CZ

ON RECONSIDERATION

Before: RONAYNE KRAUSE, P.J., and M. J. KELLY and YATES, JJ.

PER CURIAM.

Defendants, the American Civil Liberties Union of Michigan (the ACLU); and Miriam Aukerman, Elaine Lewis, and Anthony Greene, three lawyers who worked on behalf of the ACLU; appeal by leave granted[1] the trial court's order partially granting summary disposition pursuant to MCR 2.116(C)(8) (failure to state a claim) in favor of defendants as to three counts of defamation alleged by plaintiff, Grand Rapids Police Detective Robert Zabriskie, but also denying summary disposition as to a fourth count of defamation. We affirm.

## I. FACTUAL BACKGROUND

This matter arises out of a text-message conversation between plaintiff and a friend. The friend was, at the time, a juror deliberating on a criminal trial. The friend initiated the conversation to complain about serving on jury duty and one particular other juror who the friend regarded as problematic. Plaintiff was initially unaware that the friend was actually a seated juror. During the

---

[1] *Zabriskie v ACLU*, unpublished order of the Court of Appeals, entered May 27, 2021, Docket No. 356570.

conversation, plaintiff suggested that the friend could talk to the trial judge about the problem juror, urged the friend to vote her conscience, and made a comment about the problem juror being Black. The following day, plaintiff contacted the prosecutor involved in the case to report the conversation, following which he recounted the conversation on the record for that case; the court in that matter declared a mistrial. Plaintiff was subjected to an internal investigation, which concluded he had done nothing wrong. At some point, defendants obtained a copy of the transcript of plaintiff's recitation of the conversation. Defendants then sent an open letter and posted a press release on their website, generally stating that plaintiff had committed severe improprieties and calling for an investigation and some kind of sanctions. Defendants refused to retract the press release or the gravamen of the letter, although they did post an update on their website and sent a followup letter recognizing that an investigation had been conducted. Plaintiff sued for defamation by implication, alleging that defendants had implied he was a racist, implied he committed jury tampering, implied he abused his power as a police officer to exclude Black jurors from jury duty, and had accused him of being a criminal. Defendants moved for summary disposition under MCR 2.116(C)(8), which the trial court denied as to the allegation that defendants implied plaintiff abused his power as a police officer to exclude Black jurors from jury duty, but granted as to the other counts. Plaintiff has not cross-appealed.

This matter turns largely on the extent to which defendants' letters and press release are fair inferences from the transcript of the hearing at which plaintiff recounted the text message conversation. It is not disputed that defendants had a complete copy of the transcript, but they did not have a copy of the text messages themselves. At the hearing, following a discussion with the trial court in chambers, plaintiff was placed under oath. Plaintiff explained that he and the juror had been friends for approximately fifteen years and frequently joked with each other over text messages, and they sometimes exchanged advice. He explained, "so, when I got this message, I thought she was joking around. And so, I sent her one joking back. And then – and from there, I realized she was actually on a jury and serious. And then, I gave her some pretty strict instructions." At the trial judge's request, plaintiff then read the message exchange as follows:

> At 8:27 p.m.,[2] I received a – or this text thread started, and I received a text message that said "Jury duty is a nightmare." In capitals. "Never again. That is all."

> And I sent her back "this is not" – and "not is in capital letters – "a nightmare. It is your civic duty. We need good people to show up and say they don't have a preconceived notions [*sic*] about guilt or innocence, and then, find the defendant guilty. Duh. LOL." She says – and then, I said "Maybe you'll get assigned to one of my cases, and then, they will bounce you off because we know each other."

---

[2] In his complaint, plaintiff alleged that he received the first text message at approximately 7:00 p.m.

And her next sentence is "I cannot tell details, but it is horrible. Fellow juror is disgruntled. Don't know who to talk to. Like flipping out, crying, stomping feet, and obnoxious."

And I said "Disgruntled?" And my next sentence was "Tell the Judge." And I said – the next thing I sent was "Seriously." And then, she sent "We are not allowed to talk." And I said – the next direct sentence is "Tell the bailiff in a written note to tell the Judge." And then, I asked "What Judge?" And she says "Benson." And she says "Refused to ride the elevator with the rest of us." And I sent "For sure, tell the bailiff with a written note to ask to speak to the Judge." And she sends back "Okay. But doesn't that mean we have to start over? We are at deliberations." And then, I asked "Have they excused the alternate jurors yet? And she says "Yes." And I said "Yeah, it would be a mistrial." And she says "Ugh."

And then, I said, "Without telling me specifics, have you as a group started to discuss the case, like review evidence and vote?" And she said "Yes. Five minutes from wrapping up." And I said, "What was the person's problem? Was it a dispute about the case, or was it about the trauma of whatever was in the case, or was the person just a pain in the ass?" And that's what I said. And she said "Literally stated "if y'all don't agree with me, y'all will be back tomorrow."

And I said "What is her position? Is it like 11 to one against her?" And she said "Even though there is evidence, she, from the start," was having guilty – not having – I'm sorry, "Even though there is evidence, she, from the start, was not having 'guilty,' due to not enough evidence. Blame the police and the detectives." She says "distrust of the detectives not knowing their jobs. I am at a loss. We all are. Turned in her chair to face the wall, and refused."

I said "So let it be a hung jury. Tell the Judge. Same result either way. If you feel beyond a reasonable doubt that the person is guilty, then, either (a), just vote your conscience, and let the chips fall where they may, or (b), tell the Judge she made up her mind in advance and is a problem."

And she says "Whatever. I will see what tomorrow brings. Hopefully an apology is given." And then – because her text messages were coming through at the same time we're both typing, she says "Understood." And I said, "Don't hold your breath for a jackass not to act like a jackass." And she said – I said "Just vote guilty, and stick to your convictions." Because she had previously said that.

"She is too intimidating to people. It was so ridiculous that people were changing their vote. Truly disappointing." And I asked "Is she the jury foreperson or foreman?" And she says "No. That is who told them to lower their voice so others could speak via hand-raising, and openly stated 'This is how I talk, and I will not lower my voice.' Nobody is allowed to speak. Obnoxious." And I said "Wow." And she said "Went off." "Off" is capitalized. And I asked "Is this a black lady?" And she says "Yes." And I said, "Oh, okay." And then "Crying, shows emotion,

that's not in the rules.  Wow."  And I said[3] "Yeah, well, you have helped.  Gave direction.  And my grounds are emotions and intimidating fellow jurors.  Thank you."  And I sent her a thumbs up, and then, I went and took care of my kids. . . . I mean, put my kids to bed.

Plaintiff explained that he did not know the defendant in that case, nor did he know any of the facts of the case.  The trial court thanked plaintiff for bringing the matter to its attention, but it expressed concern that a juror had received instructions from outside the courtroom.[4]

A few days later, Kent County Prosecutor Chris Becker asked the Michigan State Police to "open an investigation into the matter," and he asked "the Attorney General to appoint a special prosecutor to review [the] matter."  The Attorney General "appoint[ed] the Ottawa County Prosecutor's Office to handle the investigation and any charging decisions regarding possible jury tampering."  On January 15, 2020, "the Ottawa County Prosecutor's Office conclude[d] that no charges [were] warranted."  In a memorandum, the Ottawa County Prosecutor opined that plaintiff had not "intended to commit the offense of Jury Tampering or any other associated type of offense," listing numerous grounds for this conclusion.  The Ottawa County Prosecutor concluded, in part, that it was clear plaintiff did not initially believe the juror was serious and undertook proper actions upon learning the juror was both serious and on a jury.  In sum, the Ottawa County Prosecutor concluded that any fault lay with the juror.  Becker believed the matter concluded, and he opined that he did "not know what else the Kent County Prosecutor's Office could have done in this matter."

It is not clear how or why defendants became aware of what occurred in the criminal matter.  However, it is undisputed that defendants obtained a complete copy of the transcript at which plaintiff described the text message exchange.  On July 16, 2020, the individual defendants, on behalf of defendant ACLU of Michigan, emailed an open letter to Kerene Moore of the Michigan Department of Civil Rights and Brandon Davis of the Office of Oversight and Public Accountability, presenting a "Complaint Regarding Jury Tampering by Grand Rapids Police Department Detective."  The letter stated:

> We are writing to you Ms. Moore, as the attorney leading the investigation into the Grand Rapids Police Department (GRPD), and to you Director Davis, as the Director of the Grand Rapids Office of Oversight and Public Accountability, to make you aware of a situation involving the GRPD that strikes at the heart of our criminal justice system.  It is so significant that we are sure that you will agree with us that it warrants investigation to determine what happened, including whether

---

[3] Plaintiff apparently misspoke; in the actual text message exchange, it was his friend who said this.  Nevertheless, as noted, defendants had access only to the transcript.

[4] Although not included in the transcript excerpt attached to the complaint, defendants attached a complete copy of the transcript from the criminal proceeding to their brief on appeal, and the complete copy reflects that the trial court did ultimately decide to declare a mistrial.

appropriate discipline was imposed, and to assist in developing policies, procedures and officer training to make sure it never happens again.

On or about December 4, 2019 a sitting juror in a criminal matter, during deliberations, contacted a Grand Rapids Police Detective, Robert James Zabriskie, and the two of them engaged in a text message conversation about another juror who did not want to vote guilty. The detective's account of the conversation is recorded in his testimony during a hearing held after the prosecutor brought the exchange to the attention of the court. A transcript of the hearing is attached. Based on the exchange, a mistrial was declared in the case. To our knowledge, the officer has not been disciplined in any way.

During the text exchange, Detective Zabriskie almost immediately made comments that could influence the juror's deliberations, texting that "we need good people to show up and say they don't have a preconceived notions about guilt or innocence, and then, find the defendant guilty. Duh." The juror recounts frustration with the other juror who was unwilling to vote guilty. Detective Zabriskie appears to provide legal advice and advocate to have the dissenting juror, who was reportedly convincing other jurors to vote not guilty, expelled. Expulsion of a dissenting juror could obviously steer the outcome of deliberations. When the juror who was texting reported that other jurors were beginning to consider the dissenting juror's point of view, Detective Zabriskie told her to "just vote guilty and stick to [her] convictions." Detective Zabriskie, who has been with the GRPD for over 24 years and serves as an instructor, should have known right from the beginning that it was inappropriate to communicate with a sitting juror. Yet he ignored that, inquired about the status of deliberations, provided legal advice, and attempted to sway the outcome.

What also sticks out in the exchange is that Detective Zabriskie introduced race into the conversation. In response to comments about the dissenting juror being "obnoxious" and highly emotional, he asked: "is this a black lady?" The introduction of race into the conversation by the detective shows a deeper prejudice that is all too common in police forces and in the criminal justice system. Why would this detective assume that a woman who is obnoxious or highly emotional is Black? Why would this detective assume that only a Black juror could care about the concerns that this woman had raised about the quality of the evidence?

Additionally, immediately after learning that the dissenting juror was Black, the detective changed tactics. He went from (a) telling the juror that he was corresponding with that she had the option to either vote guilty and see what happens or try to get the juror expelled, to (b) solely recommending that she seek to have the dissenting Black juror expelled. Pushing for the expulsion of Black jurors on the basis of their race is more than evidence of a willingness to take racially discriminatory actions, even when they clearly violate the law. It is a flagrant attempt to undermine defendants' constitutional right to a jury of their peers and threatens the entire criminal justice system. That a GRPD detective would show such little regard for the laws that he is sworn to uphold is extremely

troubling. The fact that a GRPD detective would violate such important laws in service of racial discrimination is completely unacceptable.

We are also deeply concerned that there was no investigation by the prosecutor's office. If this communication had been with anyone other than a detective, there would have been an investigation by the prosecutor's office and probably jury tampering charges for the individual that engaged in the communication. We would therefore ask that your investigation include inquiry into the failure of the prosecutor's office to take any action here.

We would ask that both of your offices open investigations into this matter and, based on those investigations, recommend further actions including appropriate discipline for the detective and necessary policy and procedure changes, as well as training, at the GRPD to prevent any further such instances.

Contemporaneously, defendant the ACLU of Michigan issued a public press release:

Today the American Civil Liberties Union of Michigan (ACLU) is calling for an investigation into an apparent jury tampering incident involving a Grand Rapids Police Department (GRPD) detective and a sitting juror who texted each other during deliberations in a criminal trial, according to the detective's court testimony. The ACLU sent a letter, with the corresponding testimony transcript, to the Grand Rapids Office of Oversight and Public Accountability and the Michigan Department of Civil Rights urging an investigation to determine whether appropriate discipline if any was imposed and to develop policy and officer training to ensure similar incidents do not happen again.

This incident occurred on Dec. 4, 2019 after a jury had begun deliberations in a criminal case in the 17th Circuit Court. GRPD Detective Robert James Zabriskie and a sitting juror texted about another juror who apparently did not want to vote guilty during deliberations. According to court testimony, Det. Zabriskie texted the juror that "we need good people to show up and say they don't have a preconceived notions about guilt or innocence, and then, find the defendant guilty. Duh."

"It is a serious threat to our legal system for an active member of law enforcement to directly communicate with a sitting juror about a case, let alone during deliberations," said Elaine Lewis, ACLU of Michigan attorney. "There is no excuse for this abuse of power and lack of respect for the sworn oath of a juror whose duties and deliberation are sacrosanct."

The trial impacted by this incident involved an accusation of drug possession with intent to distribute. According to the defense attorney the case is expected to be retried. The jury was majority white with one Black juror.

The court testimony shows that Det. Zabriskie also introduced race into the texting exchange. When the sitting juror commented about the dissenting juror being "obnoxious" and emotional, Det. Zabriskie texted, "is this a black lady?"

-6-

Upon learning the dissenting juror was Black, he went further to advocate that the dissenting juror be expelled.

"A police detective pushing for the expulsion of a Black juror on the basis of their race is discrimination, it's dangerous, and it's wrong," said Anthony Greene, an ACLU of Michigan cooperating attorney who co-authored the letter. "A police detective texting a sitting juror is a threat to the criminal legal system as a whole."

Det. Zabriskie has been with the GRPD for more than 24 years and also serves as an instructor. The ACLU asks both the Michigan Department of Civil Rights and the Grand Rapids Office of Oversight and Public Accountability to review this incident and recommend further actions, including whether any discipline that was imposed on the detective was appropriate and what policy and procedure changes, as well as training for the GRPD, are necessary to prevent similar incidents from happening again.

On July 20, 2020, Becker wrote a letter to non-party Dave Noble, the executive director of defendant ACLU of Michigan, pointing out that defendants were factually incorrect to state that no investigation had been conducted and complaining that "nobody from the ACLU ever bothered to ask anyone in [his] office what happened." Becker recounted the timeline set forth above, and then stated:

I do not know what else the Kent County Prosecutor's Office could have done in this matter. I believe I followed every tenant [*sic*] of the Rules of Professional Conduct, the law, and common sense. I would have been happy to share this timeline prior to the ACLU letter being sent out, but I was never given the opportunity. I heard nothing about the ACLU's desire to call for an investigation—an investigation that had already been conducted—until July 15th, the day before the letter was disseminated. Ms. Aukerman called me late that afternoon and left me a message. I responded with a voicemail asking for clarification. Later that evening she left another message notifying me for "transparency" sake that my office would be "mentioned" in a letter that was going out the next day. At no time that day, or any day, did she or anyone with the ACLU inquire as to the facts of the case or whether an investigation was conducted.

So, the next day I was quite surprised to read the paragraph from the letter quoted above. One would expect that "transparency" means disclosing that your organization is calling for an investigation into my office before notifying MDCR, the City of Grand Rapids, and the media. Saying my office would be "mentioned" is not quite the same thing. She also did not even send me the letter directly, although she had my email. I had to read the letter on the link provided by WOOD TV 8. I then read on MLive that Ms. Lewis, who signed the letter, admitted they were "not aware" that an independent investigation had been conducted months ago.

This appears to have been either a complete failure to conduct a basic inquiry into the facts, or a reckless disregard for the truth. As a result, I hope you agree that this warrants an internal investigation. As an attorney, Ms. Aukerman should be aware that the Michigan Rules of Professional Conduct, specifically Rule 8.2(a), states: "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicative officer, or public legal office.." [*sic*] In the comment section under that rule it further states;

> Assessments by lawyers are relied on in evaluating the professional or personal fitness of persons being considered for election or appointment to public legal offices, such as attorney general, prosecuting attorney and public defender. Expressing honest and candid opinions on such matters contributes to improving the administration of justice. Conversely *false statements* (emphasis added) can unfairly undermine public confidence in the administration of justice.

The false statements regarding my office have "unfairly undermined public confidence in the administration of justice." There were Facebook posts referencing this letter and my "inaction." A community leader emailed me that morning questioning how this occurred and the status of the investigation. The story was picked up by media statewide. My office is now subject to being investigated by The Michigan Department of Civil Rights based on uninformed and false allegations. In addition, this letter publicly cast doubt on the integrity and honesty of my office and can only have a negative impact on the community's view of my ability to fairly execute my duties as Kent County Prosecuting Attorney.

All this could have been avoided by a simple investigation into what happened. There was no FOIA request to my office, no email communications or phone calls to me or anyone in my office asking questions about this matter. I was informed via email later on the 15th, [*sic*] after the letter was released, that, "members of our legal committee reached out to individual prosecutors, local defense attorneys and defense counsel in this case to try to find out more information, but were never told that the matter had been referred for investigation." This office was not called, what office was? How many defense lawyers, and which ones? I would hope more would be required than simply asking a few friends in the bar association, before launching such a serious allegation to a state agency, local city government, and the public at large that I am tasked to represent.

I have always made it paramount for those in this office to follow our legal and ethical responsibilities. No office is perfect, and mistakes will be made, but what occurred here seems very different. A surprise letter calling for an investigation with flashy but false allegations looks to be more an effort to stoke the fires of bitterness and resentment rather than working to ensure the civil liberties of all the people in Kent County. It is now July 20, the letter with these false

allegations remains on your website, without correction, even after your organization learned that they are completely false.

1 would hope you would take appropriate action to correct this error, and find out how it happened in the first place. In a time of divisiveness such as we are currently in, launching a false attack is not just unwelcome, it is not helpful. There are enough real issues for all of us to deal with in the criminal justice system, instead of having people inventing them.

On the same date, counsel for plaintiff sent defendants a letter advising them that their July 16, 2020, open letter and press release misrepresented the nature of the text messages as recounted in the transcript. Defendants wrote another letter to Moore and Davis to "correct the record" regarding whether an internal investigation had taken place, but reiterating their demand for further review, reiterating their concern about the substance of the text messages, and complaining that instead of condemning plaintiff, "responsible law enforcement officials . . . tried to blame the ACLU for not knowing about an investigation that apparently never saw the light of day." Further,

We are glad to learn, and to share with you, that the matter was referred for a criminal investigation by the Kent County Prosecutor's Office and that apparently there was also some internal investigation within the Grand Rapids Police Department that resulted in some form of discipline. However, we remain deeply troubled that an experienced detective responsible for training other officers was texting with a sitting juror, discussed the need for her to vote guilty, and—after hearing that another juror was allegedly emotional and obnoxious—asked whether the other juror was Black.

* * *

We recognize that neither of your offices are responsible for criminal charges, and that apparently the Ottawa County Prosecutor to whom the matter was referred concluded that criminal charges are not warranted. That does not change what we asked for, which is that both of your offices look into this matter, including whether appropriate discipline was imposed, and recommend further actions, including necessary policy and procedure changes, as well as training, at the GRPD to prevent any further such instances. For the Office of Oversight and Public Accountability, this should include a review of whatever internal affairs investigation was done. For the Michigan Department of Civil Rights, this review should include consideration of the racial comments made by the detective when texting with the juror as part of the MDCR's investigation into alleged systemic civil rights abuses by the GRPD.

It appears that defendants contemporaneously posted an "update" on their website stating that "The ACLU sent an updated letter to the Michigan Department of Civil Rights and the Office of Oversight and Public Accountability upon learning that the Kent County Prosecutor had referred this incident to the Ottawa County Prosecutor, and that there was some form of internal investigation by the GRPD." Defendants did not, however, issue any other retraction as requested by plaintiff.

Plaintiff then commenced this litigation, asserting four claims: "Defamation: Libel, and Slander per se by Implication" based on the implication that plaintiff is a racist (Count I); "Defamation: Libel, and Slander per se by Implication" based on the implication that plaintiff committed jury tampering (Count II); "Defamation: Libel, and Slander per se by Implication" based on the implication that plaintiff "abuses his power as a police office [*sic*] to keep Black jurors from serving jury duty" (Count III); and "Defamation, Libel, and Slander per se directly and by Implication" based on the accusation that plaintiff is a criminal (Count IV). In lieu of an answer, defendants moved for summary disposition under MCR 2.116(C)(8) (failure to state a claim). The trial court, following a hearing, granted summary disposition in favor of defendants as to Counts I, II, and IV. The trial court denied summary disposition as to Count III, reasoning, in relevant part:

> Defendants assert they are entitled to summary disposition on Count III of the Complaint pursuant to MCR 2.116(C)(8) because of Plaintiff's failure to state a claim upon which relief can be granted. For the reasons explained below, the Court respectfully disagrees.
>
> For a libel and/or slander action, Plaintiff has the burden of proving the defendant made a statement of fact about the plaintiff to a third person and the statement was false in some material respect, had a tendency to harm the plaintiff's reputation, and caused the plaintiff to suffer some damage.
>
> Count III alleges Defendants made libelous and/or slanderous statements per se, which implied Plaintiff abuses his power to keep Black jurors from serving. At least one fact alleged in the Defendants' press release appears to be false and implies Plaintiff's attempt to have the Black juror serving with his friend removed.
>
> Defendants made a clear statement of fact in a published press release that Zabriskie advocated for a juror to be expelled, specifically after learning she was Black. Zabriskie argues this statement is both false and that it has tarnished his reputation. He also claims Defendants clearly had evidence that refutes this statement at the time they made it.
>
> Furthermore, if Zabriskie was a public official at the time of the publication, he must prove that Defendants knew the statement was false and acted with reckless disregard or; if he was not, they were negligent in making the libelous statement(s).
>
> * * *
>
> Count III of Plaintiff's Complaint states a claim upon which relief can be granted. Whether statements referred to in this Count constitute libel and were written with actual malice, reckless disregard, or negligence are questions for the jury.

This Court granted defendants' application for leave to appeal the denial of their motion for summary disposition as to Count III.

-10-

## II. STANDARD OF REVIEW

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). A motion brought under MCR 2.116(C)(8) should be granted only where the complaint is so legally deficient that recovery would be impossible even if all well-pleaded facts were true and construed in the light most favorable to the non-moving party. *Id*. at 119. Only the pleadings may be considered when deciding a motion under MCR 2.116(C)(8). *Id*. at 119-120. Although factual allegations must be taken as true, "conclusory statements that are unsupported by allegations of fact on which they may be based will not suffice to state a cause of action." *State ex rel Gurganus v CVS Caremark Corp*, 496 Mich 45, 63; 852 NW2d 103 (2014). Any documents attached to the complaint are considered part of the pleadings. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 163; 934 NW2d 665 (2019). In general, a plaintiff need not be able to immediately prove their case to survive a motion for summary disposition. See *Durant v Stahlin*, 375 Mich 628, 645-647; 135 NW2d 392 (1965) (SOURIS, J.). The interpretation and application of statutes, rules, and legal doctrines is reviewed de novo. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008). This Court looks to the substance of pleadings rather than the formal names or labels given by the parties. *Hartford v Holmes*, 3 Mich 460, 463 (1855); *Norris v Lincoln Park Police Officers*, 292 Mich App 574, 582; 808 NW2d 578 (2011).

## III. PRINCIPLES OF LAW

In plaintiff's complaint, Count III alleges that "[d]efendants' published statements imply that [plaintiff] abuses his power as a police office [*sic*] to keep Black jurors from serving jury duty." Count III therefore unambiguously sets forth a claim for defamation by implication. This Court has recently summarized the law regarding claims for defamation by implication:

> The law of defamation arises—as a matter of state common law—from the world of tort. It seeks to protect against injury to reputation caused by the publication of falsehoods:
>
> > A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. [3 Restatement Torts, 2d, §559 at 156.]
>
> Thus, "[a] communication is defamatory if it tends to lower an individual's reputation in the community or deters third persons from associating or dealing with that individual." *Ireland v Edwards*, 230 Mich App 607, 614; 584 NW2d 632 (1998). "However, not all defamatory statements are actionable." *Id*. Generally, "[i]f a statement cannot be reasonably interpreted as stating actual facts about the plaintiff, it is protected by the First Amendment." *Id*. See also *Milkovich v Lorain Journal Co*, 497 US 1, 20; 110 S Ct 2695; 111 L Ed 2d 1 (1990). "Thus, at least some expressions of opinion are protected." *Ireland*, 230 Mich App at 614, citing *Milkovich*, 497 US at 18–20. Otherwise, a plaintiff can establish a defamation claim by showing:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. [*Smith v Anonymous Joint Enterprise*, 487 Mich 102, 113; 793 NW2d 533 (2010) (quotation marks and citation omitted).]

\* \* \*

> A subset of the tort of defamation is known as "defamation by implication." "[A] cause of action for defamation by implication exists in Michigan, but only if the plaintiff proves that the defamatory implications are materially false." *Hawkins v Mercy Health Services, Inc*, 230 Mich App 315, 330; 583 NW2d 725 (1998). See also *Locricchio v Evening News Ass'n*, 438 Mich 84, 122; 476 NW2d 112 (1991); *American Transmission, Inc v Channel 7 of Detroit, Inc*, 239 Mich App 695, 702; 609 NW2d 607 (2000). "[S]uch a cause of action might succeed even without a direct showing of any actual literally false statements." *Hawkins*, 230 Mich App at 330. Liability for defamation by implication may be imposed based not on what is affirmatively stated, but on what is implied when a defendant "juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts [such that] he may be held responsible for the defamatory implication." Prosser & Keeton, Torts (5th ed), § 116, p 117. "A defamation by implication stems not from what is literally stated, but from what is implied." *White v Fraternal Order of Police*, 909 F2d 512, 518 (DC Cir, 1990).

\* \* \*

> "[A] court may decide as a matter of law whether a statement is actually capable of defamatory meaning." *Ireland*, 230 Mich App at 619 (citation omitted). "Where no such meaning is possible, summary disposition is appropriate." *Id*. "A communication is defamatory if, considering all the circumstances, it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id*. [*Reighard v ESPN, Inc*, ___ Mich App ___, ___; ___ NW2d ___ (May 12, 2022), Docket No. 355053, slip op at pp 5-8.]

Furthermore, the parties correctly agree that, because plaintiff is a police officer, he is a "public official" for defamation purposes. *Tomkiewicz v Detroit News, Inc*, 246 Mich App 662, 672-673; 635 NW2d 36 (2001). Therefore, plaintiff "must also establish by clear and convincing evidence that [defendants] made the allegedly defamatory implication with actual malice." *Reighard*, ___ Mich App at ___, slip op at p 11. In a defamation-by-implication context:

> just as "actual malice" means either knowledge or recklessness with regard to *falsity*, so too, "intended" in this context means either knowledge *or recklessness* with regard to the *implication*. See, e.g., *Saenz v Playboy Enterprises, Inc*, 841 F2d 1309, 1318 (CA 7, 1988) (stating that the plaintiff must show that "the defendants

-12-

either intended *or were reckless* with regard to the potential falsity of defamatory inferences which might be drawn from the article") (emphasis added). That is, "[n]ot only must the plaintiff establish that the statement is susceptible of a defamatory meaning which the defendants knew to be false or which the defendants published with reckless disregard for its potential falsity, but also that the defendants intended to imply *or were reckless* toward the implications.["] *Id*. (emphasis added; footnote omitted). Stated another way, "the communicative-intent element of actual malice in defamation-by-implication cases can be satisfied by reckless disregard for the defamatory meaning of a statement." *Kendall v Daily News Pub Co*, 716 F 3d 82, 91 (CA 3, 2013). See also *White*, 909 F2d at 519 ("It is no defense that the defendant did not actually intend to convey the defamatory meaning, so long as the defamatory interpretation is a reasonable one."). [*Reighard*, ___ Mich App at ___, slip op at p 12 (emphasis in original from *Reighard*).]

Actual malice cannot be established solely because the speaker failed to investigate whether a communication was true before publishing it, but may be established on the basis of a deliberate decision to avoid learning the truth or a sufficiently egregious failure to engage in professional due diligence. *Reighard*, ___ Mich App at ___, slip op at p 14.

## IV. ANALYSIS

Accusing anyone, particularly a public official, of actively trying to harm other people's rights on the basis of race would tend to "harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Reighard*, ___ Mich App at ___, slip op at p 5 (quotation omitted). Indeed, defendants never seriously argue otherwise. Furthermore, defendants make very little effort to directly dispute whether they leveled such an allegation at plaintiff, nor would such an argument be plausible. Although defendants argue that plaintiff never explicitly identified specific defamatory statements, defendants fail to recognize that the courts read complaints as a whole to determine whether they contain, somewhere within, all of the substance necessary to advise the opposing party of the claims presented. *Meyer v State Line Super Mart, Inc*, 1 Mich App 562, 567-569; 137 NW2d 299 (1965); *Mich Head & Spine Inst, PC v Mich Assigned Claims Plan*, 331 Mich App 262, 275-276; 951 NW2d 731 (2019); see also *Pastorino v City of Detroit*, 182 Mich 5, 8-9; 148 NW 231 (1914). Throughout his complaint, and in the attachments to the complaint, which must be taken as part of the pleadings, plaintiff set forth numerous allegedly defamatory statements.

In the July 16, 2020, letter,[5] defendants stated that plaintiff and the juror "engaged in a text message conversation about another juror who did not want to vote guilty." Although technically true, the transcript makes it absolutely clear that the juror, not plaintiff, initiated the conversation. This is a fact that profoundly changes the light in which the conversation should be viewed, and a

---

[5] Because the substance of the press release differs little from the letter, and expressly claims that plaintiff advocated for the removal of a juror on the basis of her race, we will not discuss the press release separately.

fact that defendants carefully never recounted. Defendants stated that plaintiff "almost immediately made comments that could influence the juror's deliberations, texting that 'we need good people to show up and say they don't have a preconceived notions about guilt or innocence, and then, find the defendant guilty. Duh.' " Again, this is technically true, but also again, the transcript makes it absolutely clear that this was intended as a joke[6] and that plaintiff was not yet aware that the juror was, in fact, actually seated on a deliberating jury. Once more, this is a fact that profoundly changes the light in which the conversation should be viewed, and a fact that defendants carefully never recounted. Defendants stated that plaintiff "should have known right from the beginning that it was inappropriate to communicate with a sitting juror." Although plaintiff did eventually realize he was communicating with a sitting juror, plaintiff did *not* know he was communicating with a sitting juror at "the beginning." Furthermore, as plaintiff points out, he received the initial text message somewhere between 7:00 p.m. and 8:27 p.m., well after ordinary business hours, which would imply that the friend was not at court at the time.

Defendants stated that plaintiff provided legal advice to the juror, advocated to have the problem juror expelled, and attempted to sway the outcome of the proceedings. It is arguable whether plaintiff provided "legal" advice, because plaintiff did opine that a hung jury could result in a mistrial and suggested that the juror contact the judge. However, we doubt that a lawyer, which the individual defendants are, would *really* regard plaintiff's statements as "legal advice," i.e., the unauthorized practice of law, rather than merely acting as a friend. See *Ewers v White's Est*, 114 Mich 266, 270; 72 NW2d 184 (1897). Nevertheless, contending that plaintiff rendered some kind of "legal advice" is at least minimally plausible, purely because no specific definition of "legal advice" seems to exist.[7] In contrast, nothing in the text message discussion, as set forth in the transcript, can plausibly be construed as advocating to have the juror expelled; rather, plaintiff only suggested that the juror send a message to the judge explaining the situation. Similarly, nothing can plausibly be construed as attempting to sway the outcome; rather, plaintiff

---

[6] Albeit in quite poor taste.

[7] We have found no definition of "legal advice" in published case law. *Black's Law Dictionary* (11th ed) defines it as synonymous with "advice of counsel," which, in turn, is unhelpfully defined as "the guidance given by lawyers to their clients." The term is not defined in *Merriam-Webster's Collegiate Dictionary* (11th ed). A review of numerous cases suggests that no definition has ever been deemed necessary. The Michigan State Bar's discussion of unauthorized practice of law, < https://www.michbar.org/file/professional/pdfs/uplfacts.pdf >, generally seems to indicate that "legal advice" is tailored to a particular individual's legal situation and entails the interpretation or application of laws or legal theories relevant to the implications and consequences of that individual's conduct. In a footnote annotation added to the syllabus of *Alderman v People*, 4 Mich 414 (1857), which is not precedential but is somewhat suggestive in the absence of other authority, the annotator stated: "[w]here an attorney is consulted merely as a friend, and where neither he, nor the person consulting him, supposes the relation of attorney and client to exist between them, the communications are not entitled to the privilege of secrecy extended to communications professionally made [citations to out-of-state cases omitted]." These sources, although not binding, suggest that plaintiff's advice to his friend should not be considered "legal advice."

only suggested that the juror vote her conscience—"*if* you feel beyond a reasonable doubt that the person is guilty" (emphasis added).

Defendants further stated in the July 16, 2020, letter:

> Additionally, immediately after learning that the dissenting juror was Black, the detective changed tactics. He went from (a) telling the juror that he was corresponding with that she had the option to either vote guilty and see what happens or try to get the juror expelled, to (b) solely recommending that she seek to have the dissenting Black juror expelled.

That is not a fair characterization of what occurred. According to the transcript:

> And I asked "Is this a black lady?" And she says "Yes." And I said, "Oh, okay." And then "Crying, shows emotion, that's not in the rules. Wow." And I said "Yeah, well, you have helped. Gave direction. And my grounds are emotions and intimidating fellow jurors. Thank you." And I sent her a thumbs up, and then, I went and took care of my kids.

Defendants correctly observe that there is an error in the transcript: it was actually the friend who said the final lines, not plaintiff—however, defendants had only the transcript with which to work. Nevertheless, given the context of the conversation and the fact that it was the friend who sought plaintiff's advice, it seems somewhat nonsensical for plaintiff to have spoken the final line. This should have induced at least a small amount of uncertainty on defendants' part. In any event, we are at a loss to understand how defendants construe this exchange as advocating to have the problem juror expelled. Finally, the transcript explicitly reflects that plaintiff had contacted the prosecutor of his own accord, which is another significant detail that profoundly affects the light in which plaintiff's conduct must be viewed, and again a detail that defendants failed to mention in their press release.

In short, defendants made a number of statements with some obviously cherry-picked accuracy but also a significant amount of blatant mischaracterization, the practical effect of which was to assert—directly or by implication—that plaintiff abused his role as a police detective to procure the expulsion of a juror from a sitting jury on the basis of the juror's race. Furthermore, defendants' references to seeking to prevent similar incidents from occurring again strongly imply an ongoing pattern of misfeasance. Plaintiff has clearly articulated a claim that defendants communicated a harmful, defamatory falsehood about him.

Nevertheless, as the parties agree, plaintiff must also make out a showing of actual malice. As discussed, actual malice entails the speaker actually knowing that the statement or implication was false, or the speaker recklessly disregarded whether the statement or implication was false. Defendants accurately point out that nowhere in his complaint has plaintiff alleged that they were in possession of the actual text message exchange. However, plaintiff did allege—and defendants admit—that defendants did have possession of the entire transcript and were capable of reading it. As discussed above, some of the statements set forth by defendants are simply not plausible interpretations of the transcript read as a whole, and it is difficult to imagine how defendants could have carefully cherry-picked their facts other than for the purpose of forcing them to fit a narrative

-15-

in which plaintiff was a villain instead of fairly setting forth what actually happened.  Furthermore, although merely failing to conduct an investigation is not actual malice standing alone, Becker's letter makes it clear that defendants made *no* effort to investigate and, indeed, the individual defendants may have violated MRPC 8.2(a), reflecting a total absence of concern for the truth or for conducting any diligence whatsoever.  Defendants generally contend that their interpretation of the transcript was reasonable.  We do not agree, except as to the contention that plaintiff gave the juror "legal advice."

Defendants also argue that plaintiff failed to articulate a claim of defamation per se, so he was required to allege "special harm" but failed to do so.  Plaintiff entitled Count III "Defamation: Libel, and Slander per se by Implication," which is somewhat nonsensical.  Furthermore, we recognize that Count IV, in which plaintiff expressly alleged that defendants had accused him of being a criminal, was dismissed.  However, as noted, the courts determine the nature of a claim by examining their substance rather than their label.  *Hartford*, 3 Mich at 463; *Norris*, 292 Mich App at 582.  The substance of Count III seems to allege defamation by implication.  Nevertheless, defendants have a valid point that unless an allegedly defamatory statement constitutes defamation per se, a plaintiff must also establish "the existence of special harm caused by the publication." *Kevorkian v American Medical Ass'n*, 237 Mich App 1, 8-9; 602 NW2d 233 (1999).  Plaintiff alleged that he had "suffered both personally and professionally," now fearing harms ranging from assassination to denials of promotion at work.  We will presume for the sake of argument that plaintiff's allegation of harm does not adequately state "special harm" for purposes of defamation.  Therefore, whether by implication or not, plaintiff would need to set forth a claim substantively amounting to defamation per se.

"Accusations of criminal activity are considered 'defamation per se' under the law and so do not require proof of damage to the plaintiff's reputation." *Ghanam v Does*, 303 Mich App 522, 545; 845 NW2d 128 (2014).  "However, not all statements that can be read as accusations of a crime or misconduct should be considered assertions of fact," and an epithet that would reasonably be understood "as merely 'rhetorical hyperbole' meant to express strong disapproval rather than an accusation of criminal activity or actual misconduct" is not defamatory.  *Id*. at 545-546.  Here, defendants' letter and press release appear to accuse plaintiff of misusing his power as a police officer to improperly influence a jury and improperly attempt to deprive a juror of their rights on the basis of race.  Defendants' letter and press release describe specific, concrete acts of misconduct going well beyond mere hyperbole.  Furthermore, unlike the accusations of unprofessional conduct of a wedding photographer in *Cetera v Mileto*, ___ Mich App ___; ___ NW2d ___ (2022) (Docket No. 356868), the allegations of professional misconduct of a police officer in this matter do amount to an accusation of criminal activity.  Misconduct in office is a felony applicable to police officers.  *People v Milton*, 257 Mich App 467, 470-472; 668 NW2d 387 (2003).  "To convict on the charge of misconduct in office, the prosecutor must prove that the defendant (1) is a public officer, (2) the misconduct occurred in the exercise of the duties of the office or under the color of the office, and (3) is corrupt behavior." *Id*. at 471.  There is no dispute that plaintiff is a public officer, and a plain reading of defendants' letter and press release shows that defendants believed plaintiff's conduct to be both corrupt and committed under the color of his office.  In other words, the only fair reading of defendants' published statements is that defendants did, in fact, accuse plaintiff of felonious criminal activity.

Therefore, even if that plaintiff failed to allege "special harm," plaintiff nevertheless adequately alleged—and the pleadings adequately support—a claim of defamation per se. Furthermore, plaintiff adequately specified the allegedly defamatory statements made by defendants. Defendants' letter and press release, which are part of the pleadings, clearly imply that defendant, in his role as a police officer, attempted to have a juror removed from a sitting jury on the basis of the juror's race and possibly that defendant was in the regular practice of doing so. This is a defamatory falsehood and based on a blatant misreading of the transcript that defendants had available. The total lack of diligence on defendants' part and the unreasonableness of defendants' "interpretation" of the transcript demonstrate actual malice. The trial court properly did not dismiss Count III of the complaint.

However, we caution that the portion of the trial court's order stating that "whether statements referred to in this Court constitute libel and were written with actual malice, reckless disregard, or negligence are questions for the jury" was premature. The motion was brought in lieu of an answer, and it was made (and denied in relevant part) pursuant only to MCR 2.116(C)(8). Plaintiff adequately articulated a claim. However, that does not necessarily mean there is a question of fact for the jury. Rather, it means defendants must file an answer. Of course, "[t]he inquiry into whether evidence in a defamation case is sufficient to support a finding of actual malice presents a question of law." *Smith* 487 Mich at 111. Nevertheless, that inquiry requires consideration of the entire factual record. *Id*. at 111-112. The parties must be afforded their rightful opportunity to develop such a record, and, in due course, may potentially move for summary disposition under another subrule, such as MCR 2.116(C)(10). At this stage of the proceedings, it is impossible to know whether there is a question of fact for the jury, but only whether plaintiff has articulated a claim to which defendants must respond.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Michael J. Kelly
/s/ Christopher P. Yates